In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-1474

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FAUSTINO ARRELLANO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cr-00802-3 — **Matthew F. Kennelly**, *Judge.*

ARGUED NOVEMBER 6, 2013 — DECIDED JULY 2, 2014

Before WOOD, *Chief Judge,* and FLAUM and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Faustino Arrellano was convicted of one count of conspiring to possess heroin and cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and two counts of using a cell phone to facilitate that conspiracy, in violation of 21 U.S.C. § 843(b). At trial, the government introduced Arrellano's cell phone, as well as several wiretapped telephone conversations involving Arrel-

lano's alleged co-conspirators. On appeal, Arrellano argues that his cell phone and those co-conspirator statements should have been suppressed and that the evidence was insufficient to support his convictions. However, the co-conspirator statements were properly admitted, any error in admitting Arrellano's cell phone was harmless, and the evidence was sufficient to support his convictions. Therefore, we affirm.

## I.    BACKGROUND

Our discussion of the facts is extensive because the sufficiency of the evidence at trial is at issue. In 2009, a joint task force consisting of the Chicago Police Department, the FBI, the DEA, and other federal agencies began investigating various suspected drug traffickers in the greater Chicago area. In early 2010, investigators learned that a man named Roberto Romero was distributing cocaine and heroin in the area. The FBI subsequently obtained a court-approved wiretap for Romero's phone and learned that his supplier was a man named Moises Villalobos.

During the summer of 2010, investigators turned their attention to Villalobos. The FBI secured a series of wiretaps for phones used by Villalobos, and members of the task force began conducting surveillance of Villalobos and his associates. This led to the seizure of some of the drugs that Villalobos supplied to Romero. In addition, during their surveillance, members of the task force frequently observed Villalobos driving a green Honda Accord and visiting two residences situated roughly a mile apart from each other on the northwest side of Chicago, one at 2826 North Long Avenue and the other at 2455 North McVicker Avenue.

On August 9, 2010, the FBI intercepted a call between Villalobos and an associate named Aoclaro. During that conversation, Villalobos told Aoclaro that "by day after tomorrow, a 12 is supposed to get here." On August 12, Villalobos spoke with Aoclaro again and said, "Look, because it's already here. We have got 12. There are 12 around here. We're just waiting for Ingeniero to come over so he can check the construction work for us." Based on these conversations, the FBI believed that Villalobos had received a 12-kilogram shipment of heroin.

On August 15, 2010, at 8:40 a.m., the FBI intercepted a call between Villalobos and Rosa Fernandez, who would later be charged as Arrellano's co-defendant in this case. To complete this call, Fernandez's phone utilized a cell tower covering the area of her residence in Kenosha, Wisconsin. The conversation was brief. After they greeted each other, Villalobos simply said, "It's ready," and Fernandez responded, "All right then, I will be there shortly."

About an hour later, at 9:38 a.m., the FBI intercepted a call between Villalobos and an associate named Klen. During that conversation, Klen asked Villalobos, "Will you be set with just one hand?" In response, Villalobos said, "[T]hrow in the two, we'll put some effort into it." Later, at 10:26 a.m., Villalobos spoke with Aoclaro and said, "Aside from the 12, they added another 10 on me." Based on these conversations, the FBI believed that Villalobos was about to receive a 10-kilogram shipment of heroin.

Shortly thereafter, at 10:55 a.m., Villalobos spoke with Klen again, and Klen explained that "the young guy … can't find the house." Villalobos responded, "Tell him that on Diversey and Austin there's a Dunkin' Donuts. Have him park

there and the guy will go there." At 11:07 a.m., Villalobos spoke with Klen once more, and Klen advised that his guy was wearing a red t-shirt.

Around the same time, FBI Special Agents David Ostrow and William Roecker met at the Dunkin' Donuts at the corner of Diversey and Austin in Chicago, where they spotted a Hispanic male wearing a red t-shirt and sitting in a black Nissan Sentra in the parking lot. To avoid letting on about the ongoing investigation, the agents approached the man with a ruse, telling him that they had received reports that there was someone in the area with a gun, and asking his permission to search his car. After the man consented, the agents found a black suitcase in the trunk of the car, which contained approximately 10 kilograms of heroin.

At 11:41 a.m., the FBI intercepted another call between Villalobos and Fernandez. This time, Fernandez's phone utilized a cell tower covering the area of the McVicker residence, as well as the aforementioned Dunkin' Donuts. During this call, Villalobos complained that he had been calling the "young man," and "it seems the phone is not charged. He doesn't answer me anymore." Then, Villalobos said, "Look, … from where the Dunkin' Donuts is upwards. Go around there and you will see him around there. Go around there. See if you see anything around there." Fernandez responded, "All right then. I'm on my way."

At 11:49 a.m., Villalobos called Fernandez again and asked whether she saw anything "over there at the coffee shop." Fernandez responded, "Nothing, … just people drinking coffee." Villalobos then instructed her, "Go and check by the little house and see if you see anything. Knock at the young man's door, see what's going on." At 11:57

a.m., Fernandez called Villalobos back and said, "I don't see anything. It's quiet here." For both of these calls, Fernandez's phone utilized the same cell tower covering the area of the McVicker residence and the Dunkin' Donuts.

Up to this point, Arrellano's name had yet to come up in the investigation. However, on August 15, the day of the seizure at Dunkin' Donuts, Arrellano activated a new cell phone, which he registered in his name using the address 4836 West Barry Avenue, Chicago, Illinois. This was the same address Fernandez had used for her cell phone registration, though neither Arrellano nor Fernandez actually lived there. All of the calls Arrellano made or received on his new cell phone between 5:45 p.m. on August 15 and 11:53 p.m. on August 17 utilized a cell tower covering the area of Fernandez's residence in Kenosha, Wisconsin. Three of those calls involved another Villalobos associate known as Gau.

At 12:40 p.m. on August 17, ten minutes after one of Arrellano's conversations with Gau, Villalobos called Fernandez's phone and asked to speak to "the young man." In response, Fernandez put Arrellano on the phone. Villalobos then asked Arrellano, "What's going on, buddy? I have been calling you." Arrellano explained that he had a new number, to which Villalobos replied, "All right. Call me with the other one." A few minutes later, Arrellano called Villalobos from his new cell phone. During that conversation, Arrellano described the situation as "a little hot" and said, "It's not possible to work. Basically the only thing to do is to wait."

A few minutes after this conversation with Arrellano, Villalobos spoke with Gau, who said, "We been trying to locate you. My buddy is pretty spooked out. His hair is standing … up." Villalobos responded, "Well, yes, cousin. I called

him a little while ago. He said he's worried. On top of that, he's with a lady, a friend of ours. She's alone. It's good the buddy is keeping her company."

Later in the same conversation, Villalobos told Gau, "The thing is that, eh, one of our comrades around there, they took him to the hospital over there with … 10 countrymen that were coming with him, and that's why we made a little space, cousin." Gau asked, "Oh, that young man, if he went to the hospital, he's going to stay there for a long while, right? He'll be admitted. That's almost cancer for life, right?" Villalobos responded, "Right now there are two possibilities. They may let them free or they may keep them inside, cousin. I believe right now there's only an ambulance around there. I think if there's only one ambulance, sometimes they keep the tools and they let them go, cousin. Right now since like, you know, the crisis is tough, that's what the fuckers are doing."

Later that evening, at 8:30 p.m., Villalobos spoke with Arrellano again and asked him to "come on over tomorrow so you can check it out." When Arrellano asked why, Villalobos said, "To see if you can tell the lady to get my goats out." Arrellano then asked, "Did they … take the tools away already?" Villalobos responded, "Eh, no, not yet. They're going to go tomorrow." Villalobos noted that Arrellano would need to "go over there pretty early" and asked him to make arrangements with "the cousin Adan" to get the key and "take out the, eh, the little truck." Arrellano suggested that if "he can go very early, way before," then "everything will be left clean and there's … nothing left to do." Villalobos agreed and said, "And so you can get in there, too." Arrella-

no responded, "Yes, the most … we'll need to be there will be an hour. That's all."

Later that night, at 11:53 p.m., Villalobos called Arrellano again and told him to "come over around 7:00, 7:30." Then, Villalobos asked to speak to Fernandez. After Arrellano put Fernandez on the phone, Villalobos and Fernandez discussed their plans to meet the next day, and Villalobos asked Fernandez to bring a large suitcase. Based on these conversations, the FBI anticipated that Villalobos was going to meet Arrellano and Fernandez at the Long residence the next day.

At 6:36 a.m. the next morning, August 18, the FBI intercepted a call between Villalobos and an associate known as Ingeniero (the Spanish word for engineer). Ingeniero's cell phone was registered to a post-office box in Irvine, California, but it had a South Carolina area code, and it utilized a cell tower in South Carolina to complete this call. During the conversation, Villalobos asked, "Where do you have it right now?" Ingeniero responded, "It's in the garage in the Harvey." Based on this call, the FBI believed that the 12-kilogram shipment of heroin Villalobos had previously received had been moved to a garage in Harvey, Illinois.

Also on August 18, at around 7:30 a.m., the task force set up surveillance of the Long house. At 8:52 a.m., Fernandez was spotted sitting in her beige Chevy Malibu in the alley behind the house. Shortly thereafter, Fernandez got out of the car and opened the trunk, at which point Villalobos and another Hispanic male walked into the alley and put two bags into the trunk. Villalobos's girlfriend, Anahi Diaz, followed. At that point, Fernandez, Diaz, and Villalobos got into the car and drove away, while the unidentified Hispanic male stayed behind. Fernandez then drove Villalobos and

Diaz to the Marriott hotel on North Michigan Avenue in Chicago, where she dropped them off.

At 10:15 a.m., Arrellano called Villalobos utilizing a cell tower covering the area of the Long residence. During that call, Arrellano asked Villalobos to "call the lady to see if there's anything else here." Villalobos advised Arrellano that if he was finished, he should "go over there where she picked you up the other time, so she can go over there and that's it." About a half hour later, Villalobos called Fernandez and said, "The guy told me you should go pick him up already where you picked him up the last time."

Later that evening, at 6:26 p.m., Arrellano spoke with Villalobos again and told him, "no matter what you can't lower your guard. You have to be alert at all times. Be careful." Villalobos agreed and said, "I'll have the number for this cousin, Adan, and we are going to keep on trying hard." Then, referring to "the little truck," Arrellano said, "I put all the tools in there, so nothing is left inside over there, in the house."

The next day, August 19, members of the task force arrested Villalobos at the Marriott hotel on Michigan Avenue. Then, with Villalobos's consent, they searched his hotel room. The search turned up more than $4,000 in cash, two cell phones, and various documents, including a list of phone numbers. That list included phone numbers for Aoclaro, Klen, Gau, and Fernandez (under the nickname Polamitu). However, it did not include Arrellano's name or phone number.

Later that evening, members of the task force searched the Long and McVicker residences. At the McVicker resi-

dence, they found nearly a kilogram of cocaine, about one and a half kilograms of heroin, and $774,500 in cash. However, they found nothing of evidentiary value at the Long residence. Indeed, as Chicago Police Officer Jason Brown testified, the Long residence "had the appearance of a house that was recently lived in, and somebody appeared to have left in a hurry."

Meanwhile, the task force began tracking the GPS coordinates of Arrellano's cell phone. By 11:41 p.m. on August 19, the day Villalobos was arrested, the phone had moved to Arrellano's residence in Lula, Georgia. However, just before midnight on August 23, calls were made between Arrellano's phone and a recently activated cell phone that had the same South Carolina area code and was registered to the same California post-office box as the phone previously used by Ingeniero, the Villalobos associate who had indicated that the heroin had been moved to a garage in Harvey, Illinois. The next day, August 24, Arrellano's phone moved from his residence in Georgia to a house located at 16000 Carol Avenue in Harvey, Illinois. During that trip, two calls were made between Arrellano's phone and Gau's phone.

The night of August 24, about eight or nine agents set up surveillance of the Harvey residence. At 9:50 p.m., GPS data showed that Arrellano's cell phone had moved away from the residence. Then, at around 10:00 p.m., the agents saw the green Honda Accord they knew to be associated with Villalobos arrive at the house and park in the detached garage. At 10:21 p.m., GPS data confirmed that Arrellano's phone was back in the residence.

At around 10:45 p.m., the agents knocked loudly on the front door of the house, announcing that they were law en-

forcement and asking to speak to someone inside. When no one answered, they walked around all sides of the house, shouting and knocking loudly on all of the doors and windows that were accessible to them. This continued intermittently for nearly an hour. At one point, Harvey police officers arrived at the scene, responding to a call from someone inside the house. However, those officers left after they too tried knocking on the front door but received no answer.

At around 11:40 p.m., after a short lull in the agents' knocking, a man named Alfredo Avilla Anzures (hereinafter, "Avilla") opened the door. DEA Special Agent Robert Fergus approached Avilla and asked permission to come inside and talk, to which Avilla ostensibly consented. As Avilla and Agent Fergus retreated into the living room, about six or seven other agents rushed into the house to conduct a protective sweep. The agents found several other people in the house and brought them all into the living room, including Arrellano, who was sleeping in one of the bedrooms. Agent Fergus then asked Avilla if they could look around, and again, Avilla ostensibly consented.

Meanwhile, FBI Special Agent Roecker, who had taken part in the August 15 seizure, was outside on his cell phone, speaking with an Assistant United States Attorney about the possibility of obtaining a search warrant. After learning that Agent Fergus had obtained consent to enter and search the residence, Agent Roecker also entered and joined in the search. In doing so, he found the phone registered in Arrellano's name in the bedroom where Arrellano had been sleeping. Agent Roecker then returned to the living room and asked who the phone belonged to, and Arrellano indicated that the phone was his. Agent Roecker contacted an-

other agent who was familiar with the voice on the calls that were intercepted involving that cell phone. Then, Agent Roecker put Arrellano on the phone with the other agent, who identified Arrellano's voice as the one on those calls.

Ultimately, the agents obtained Avilla's consent to search the Honda Accord in the garage as well, and they found 24 packages containing over 13 kilograms of heroin. Arrellano was arrested and charged in the U.S. District Court for the Northern District of Illinois with one count of conspiring to possess heroin and cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and two counts of using a cell phone to facilitate that conspiracy, in violation of 21 U.S.C. § 843(b). The first cell phone count was based on the 8:30 p.m. call on August 17, 2010, during which Villalobos and Arrellano made arrangements to meet and clean out the Long house the next morning. The second cell phone count was based on the 6:26 p.m. call on August 18, 2010, when Arrellano advised Villalobos to remain cautious and told him that he had put all the "tools" in the little truck, "so nothing is left inside over there, in the house."

Before trial, Arrellano moved to suppress his cell phone, as well as the statements he made to law enforcement and the voice identification obtained when he was arrested on August 24. The district court suppressed the voice identification and Arrellano's statements, finding that he was subjected to custodial interrogation without *Miranda* warnings. However, the district court denied Arrellano's motion to suppress his cell phone, finding that Avilla had apparent authority to consent to the search of the bedroom and that Avilla's consent was voluntary.

Also before trial, the government moved to admit the statements of Arrellano's alleged co-conspirators from the intercepted phone calls discussed above. The district court granted the motion subject to the government's proof of the foundational elements for the co-conspirator hearsay exception at trial. At the close of the government's case, Arrellano objected to the co-conspirator statements on the ground that the government had not proved the foundational elements by a preponderance of the evidence, but the district court disagreed and overruled the objection.

At trial, the government also introduced call records for Arrellano's cell phone, which catalogued the calls he made and received during the relevant time period and identified the cell tower used for each call. Arrellano stipulated that these records were accurate, that the phone was subscribed in his name, and that it was activated on August 15, 2010. In addition, a contract linguist for the FBI testified that she compared the voices on all of the calls that were intercepted involving Arrellano's phone, and the same voice was heard on all of them. Also, the government presented expert testimony from an experienced narcotics investigator to establish that drug traffickers often speak in coded language, although the expert did not testify about any of the particular language used by the conspirators in this case. Finally, the government introduced GPS data showing the location of Arrellano's phone from August 19 to 24, 2010, as well as a deed showing that Arrellano owned the property where the phone was located in Lula, Georgia, before it moved to the residence where he was arrested in Harvey, Illinois.

Ultimately, the jury found Arrellano guilty on all three counts. Arrellano subsequently moved for a judgment of ac-

quittal or a new trial, but the district court denied the motion and sentenced him to 120 months' imprisonment and five years' supervised release. Arrellano now appeals, arguing that the district court should have suppressed his cell phone and the co-conspirator statements and that the evidence was insufficient to support his convictions.

## II.    DISCUSSION

We begin with Arrellano's argument that the evidence was insufficient to support his convictions, as our resolution of that issue is relevant to our resolution of Arrellano's suppression arguments as well.

### A.  SUFFICIENCY OF THE EVIDENCE

"We will overturn a verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Reed*, 744 F.3d 519, 526 (7th Cir. 2014). With respect to the drug-distribution conspiracy charge, "the question is whether any rational juror could find that (1) two or more people agreed to possess and distribute cocaine [and heroin], and (2) [Arrellano] knowingly and intentionally joined in this agreement." *United States v. Luster*, 480 F.3d 551, 555 (7th Cir. 2007). With respect to the cell phone charges, the question is whether Arrellano "knowingly or intentionally" used his cell phone to facilitate the underlying drug-distribution conspiracy. 21 U.S.C. § 843(b); *see also United States v. Jones*, 713 F.3d 336, 346 (7th Cir. 2013).

Arrellano does not dispute that Villalobos orchestrated a conspiracy to distribute heroin and cocaine in the Chicago

area in 2010. Villalobos's statements and the large quantities of those drugs seized at the Dunkin' Donuts on August 15, the McVicker residence on August 19, and the Harvey residence on August 24 were sufficient to establish the existence of the conspiracy. However, Arrellano contends that the evidence was insufficient to establish that he ever joined the conspiracy, or that he used his cell phone to facilitate the conspiracy. We disagree.

We begin with the events of August 15, 2010, when FBI agents intercepted a 10-kilogram shipment of heroin intended for Villalobos. While Villalobos was trying to figure out what was going on with the shipment, he spoke to Fernandez and expressed his frustration at not being able to reach "the young man," saying "it seems the phone is not charged. He doesn't answer me anymore." A little later, Villalobos instructed Fernandez to look around, "[k]nock at the young man's door, see what's going on."

The same day, Arrellano activated a new cell phone. Then, beginning that evening and continuing over the next couple of days, Arrellano made and received calls on his new phone utilizing a cell tower covering Fernandez's residence in Kenosha, Wisconsin. Three of those calls involved a Villalobos associate named Gau.

On August 17, Villalobos called Fernandez and asked to speak to "the young man." In response, Fernandez put Arrellano on the phone. Villalobos asked, "What's going on, buddy? I have been calling you." Arrellano explained that he had a new number and then proceeded to call Villalobos from his new phone. During that conversation, Arrellano described the situation as "a little hot" and said, "It's not possible to work. Basically the only thing to do is to wait."

A few minutes after this conversation with Arrellano, Villalobos spoke with Gau, who said, "We been trying to locate you. My buddy is pretty spooked out. His hair is standing … up." Villalobos responded, "Well, yes, cousin. I called him a little while ago. He said he's worried. On top of that, he's with a lady, a friend of ours. She's alone. It's good the buddy is keeping her company."

A reasonable jury could have inferred from this evidence that Arrellano was "the young man" who was supposed to receive the August 15 shipment of heroin for Villalobos. When the shipment was intercepted by the FBI, Arrellano got scared, ditched the cell phone he had been using, activated a new cell phone, and left the Chicago area with Fernandez. This view is also supported by the fact that when Arrellano was done cleaning out the Long house on August 18, Villalobos called Fernandez and said, "The guy told me you should go pick him up already where you picked him up the last time." Thus, a reasonable jury could have found that Arrellano's participation in the conspiracy began on August 15.

But his participation in the conspiracy did not end there. On the evening of August 17, Villalobos spoke with both Arrellano and Fernandez again, making arrangements to meet them the next day. Villalobos told Arrellano to come over to "see if you can tell the lady to get my goats out." Arrellano then asked, "Did they … take the tools away already?" Villalobos responded, "Eh, no, not yet. They're going to go tomorrow." Villalobos noted that Arrellano would need to "go over there pretty early" and asked him to make arrangements with "the cousin Adan" to get the key and "take out the, eh, the little truck." Arrellano suggested that if "he can

go very early, way before," then "everything will be left clean and there's … nothing left to do." Villalobos agreed and said, "And so you can get in there, too." Arrellano responded, "Yes, the most … we'll need to be there will be an hour. That's all."

The next morning, Villalobos, Diaz, Fernandez, and a then-unidentified Hispanic male were seen in the alley behind the Long residence. Villalobos and the unidentified Hispanic male put two bags into the trunk of Fernandez's car, then Fernandez drove Villalobos and Diaz to the Marriott hotel on Michigan Avenue. The unidentified Hispanic male stayed behind at the Long residence.

A little later, Arrellano called Villalobos utilizing a cell tower covering the area of the Long residence and asked him to "call the lady to see if there's anything else here." Villalobos advised Arrellano that if he was finished, he should "go over there where she picked you up the other time, so she can go over there and that's it."

Later that evening, Arrellano spoke with Villalobos again and told him, "no matter what you can't lower your guard. You have to be alert at all times. Be careful." Then, referring to "the little truck," Arrellano said, "I put all the tools in there, so nothing is left inside over there, in the house." And indeed, when the house was searched after Villalobos's arrest on August 19, nothing of evidentiary value was found. As Officer Brown testified, it "had the appearance of a house that was recently lived in, and somebody appeared to have left in a hurry."

A reasonable jury could have inferred from this evidence that Arrellano was the Hispanic male seen at the Long house

with Villalobos, Fernandez, and Diaz on August 18 and that Arrellano helped removed drugs from the house in furtherance of the conspiracy. Arrellano contends that the government failed to prove that he removed anything more than tools from the house, because it introduced no evidence that the word "tools" was code for "drugs." But contrary to his assertion, the government was not required to present expert testimony on this point. Instead, Villalobos's conversation with Gau on August 17 provided ample support for the government's position. During that conversation, Villalobos and Gau discussed the seizure that occurred on August 15, and Gau wondered whether the man who was found in possession of the heroin would be put away for a long time. In response, Villalobos opined, "sometimes they keep the tools and they let them go, cousin. Right now since like, you know, the crisis is tough, that's what the fuckers are doing." This conversation, considered in context, would allow a reasonable jury to conclude that members of the conspiracy used "tools" as a code word for "drugs."

Indeed, the use of code itself provides additional evidence of Arrellano's participation in the conspiracy. The government's expert testified that as a general matter, drug traffickers often speak in code, and it is undisputed that Villalobos was a drug trafficker. Therefore, the fact that Arrellano and Villalobos used cryptic language yet had no difficulty understanding each other further supports the inference that Arrellano was a member of Villalobos's drug-trafficking conspiracy.

A reasonable jury also could have found that Arrellano knowingly used his cell phone to facilitate the conspiracy as charged in the indictment. During the 8:30 p.m. call on Au-

gust 17, Arrellano and Villalobos made arrangements to meet the next morning and discussed the removal of Villalobos's "goats" and "tools." Then, during the 6:26 p.m. call on August 18, Arrellano told Villalobos that he had put all the "tools" in the little truck, "so nothing is left inside over there, in the house." In light of the other evidence, a reasonable jury could have inferred that these calls were about the removal of drugs from the Long house. Thus, a reasonable jury could have found that the calls were knowingly made to facilitate the conspiracy.

Moreover, Arrellano's involvement in the conspiracy did not end when Villalobos was arrested. By 11:41 p.m. on August 19, Arrellano was back at his residence in Georgia, but on the evening of August 23, calls were made between his cell phone and a recently activated cell phone that had the same South Carolina area code and was registered to the same California post-office box as the phone previously used by Ingeniero, the Villalobos associate who had indicated that the heroin had been moved to a garage in Harvey, Illinois. Then, on August 24, Arrellano drove from Georgia to a house in Harvey, speaking to Gau (another known conspirator) twice during the trip. When agents set up surveillance of the residence that evening, they saw the green Honda Accord associated with Villalobos arrive and park in the detached garage. Ultimately, the agents found 13 kilograms of heroin in that vehicle, and they arrested Arrellano at the scene.

A reasonable jury could have inferred from this evidence that Arrellano continued to communicate with members of the conspiracy after Villalobos was arrested, learned where

the heroin was located at that time, and travelled to that location in furtherance of the conspiracy.

In sum, we note that "[a] jury is not limited to direct evidence and may find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn from the relationship of the parties, their overt acts, and the totality of their conduct." *United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008). When we consider all of the reasonable inferences discussed above in combination, we find overwhelming evidentiary support for the proposition that Arrellano was a member of a drug-distribution conspiracy and used his cell phone to facilitate that conspiracy on both of the occasions charged in the indictment. Therefore, a reasonable jury could have found him guilty beyond a reasonable doubt on all three counts, and we will not disturb a verdict so amply supported.

## B. CO-CONSPIRATOR STATEMENTS

Next, Arrellano argues that the intercepted phone calls the government introduced at trial contained inadmissible hearsay that should have been excluded. However, under Federal Rule of Evidence 801(d)(2)(E), a statement offered against a party is considered nonhearsay so long as it "was made by the party's coconspirator during and in furtherance of the conspiracy." To invoke this rule, the government must prove by a preponderance of the evidence "that a conspiracy existed, the defendant and the declarant were members of the conspiracy, and the statement was made during and in furtherance of the conspiracy." *United States v. Villasenor*, 664 F.3d 673, 681–82 (7th Cir. 2011).

Before trial, the district court conditionally admitted the intercepted phone calls subject to the government's ability to prove the foundational elements for the co-conspirator hearsay exception at trial. At the close of the government's case, Arrellano objected to the calls, arguing that the government failed to do so, but the district court disagreed and overruled the objection. "We review the district court's findings with regard to these elements for clear error." *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010) (quoting *United States v. Skidmore*, 254 F.3d 635, 638 (7th Cir. 2001)). In doing so, we must keep in mind that the statement sought to be admitted "must be considered but does not by itself establish … the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2).

Again, Arrellano does not dispute that a drug-distribution conspiracy existed. Nor does he dispute that the statements of his alleged co-conspirators were made during and in furtherance of that conspiracy. Instead, he argues that the government failed to prove by a preponderance of the evidence that he ever joined the conspiracy. But as discussed above, a reasonable jury could have found that Arrellano joined the conspiracy beyond a reasonable doubt. Therefore, we cannot say that the district court clearly erred in finding that the government met its burden under the lesser preponderance standard.

Arrellano complains that many of the statements admitted against him were made before he allegedly joined the conspiracy. But "it is well established that a defendant who joins a conspiracy '[takes] the conspiracy as he found it. When he joined and actively participated in it he adopted the previous acts *and declarations* of his fellow co-

conspirators.'" *United States v. Adamo*, 882 F.2d 1218, 1230–31 (7th Cir. 1989) (alteration in original) (quoting *United States v. Coe*, 718 F.2d 830, 839 (7th Cir. 1983)). Thus, "it is irrelevant when [Arrellano] joined the conspiracy, so long as he joined it at some point." *United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004). The evidence was sufficient to establish that he did.

Moreover, that evidence was not limited to the statements of his co-conspirators; among other things, it included his own telephone conversations, cell phone records showing that he made calls from Fernandez's residence in Kenosha and the Long residence in Chicago, and GPS data tracking his phone from Georgia to the house in Harvey where law enforcement found approximately 13 kilograms of heroin. Because the evidence of Arrellano's participation in the conspiracy was strong and was not limited to the co-conspirator statements themselves, those statements were properly admitted.

## C. ARRELLANO'S CELL PHONE

Finally, Arrellano argues that his cell phone should have been suppressed because Avilla's consent to the search of the Harvey residence was both involuntary and tainted by his unlawful detention. At least with respect to voluntariness, Arrellano has a point. Avilla allowed agents to enter the Harvey residence only after they pounded on its doors and windows for nearly an hour, and he consented to a search of the house only after several agents rushed in and conducted a protected sweep of every one of its rooms. Under these circumstances, it could be a stretch to consider Avilla's consent to the search to have been voluntary. How-

ever, we need not resolve the issue, because error, if any, in admitting Arrellano's cell phone would have been harmless.

Although the government did not argue harmlessness in its brief, "we are authorized, for the sake of protecting third-party interests including such systemic interests as the avoidance of unnecessary court delay, to disregard a harmless error even though through some regrettable oversight harmlessness is not argued to us." *United States v. Ford*, 683 F.3d 761, 768 (7th Cir. 2012) (quoting *United States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir. 1991)). In this case, any error in admitting Arrellano's cell phone was clearly harmless. Therefore, we decline to prolong the case by ordering a new trial on the ground that the phone should have been excluded.

Arrellano argues that he was harmed by the introduction of the phone because it was the "only physical evidence" that connected him to the alleged conspiracy. However, physical evidence is not required to support a conviction, nor is it inherently better than other evidence. *Cf. United States v. Re*, 401 F.3d 828, 834 (7th Cir. 2005) (quoting *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995)) (noting that "circumstantial evidence may be the sole support for a conviction" and that it "is not less probative than direct evidence and, in some cases is even more reliable"). And as discussed above, there was plenty of other evidence to establish Arrellano's participation in the conspiracy. Indeed, we found no need to even mention the physical phone in our earlier discussion of the sufficiency of the evidence.

Even so, Arrellano argues that he was harmed by the introduction of the phone because the government highlighted it as a significant piece of evidence and insisted that it be

sent back with the jury. However, the government did not rely on any data recovered from the phone, such as stored contacts or call history; it had phone records to prove those things. Thus, the only fact that the introduction of the phone itself tended to prove was that Arrellano physically possessed it at the time of his arrest, and consequently, that he was the person who used the phone during the relevant period.

However, Arrellano stipulated that the phone was subscribed in his name, and GPS data showed that it moved from the house he owned in Lula, Georgia, to the house where he was arrested in Harvey, Illinois. Thus, even if the physical phone had been suppressed, no reasonable jury could have concluded that someone other than Arrellano possessed and used the phone during the relevant period. Moreover, the government proved that the same voice was heard on all of the calls that were intercepted to or from that phone, so no reasonable jury could have doubted that Arrellano was the person speaking on those calls. Therefore, any error in admitting the phone was clearly harmless.

## III.  CONCLUSION

The district court properly admitted the statements of Arrellano's co-conspirators, any error in admitting Arrellano's cell phone was harmless, and the evidence was sufficient to support Arrellano's convictions. Therefore, we AFFIRM.