In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――

Nos. 17-2051, 17-2052, and 17-2060

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DUPRECE JETT, EARL WALKER,
and DAMION MCKISSICK,

*Defendants-Appellants.*

―――――――――

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cr-00001-TWP-TAB — **Tanya Walton Pratt**, *Judge.*

―――――――――

ARGUED SEPTEMBER 5, 2018 — DECIDED NOVEMBER 7, 2018

―――――――――

Before KANNE, SYKES, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Two armed men robbed three cash-and-check stores in the Indianapolis area. The heists were not especially sophisticated, but they went viral over the robbers' 1970s-themed disguises. That attention drew an anonymous tip, which led law enforcement to Duprece Jett and Damion McKissick, as well as a third man, Earl Walker, who officers believed was involved in a planned fourth robbery.

The government charged all three men with conspiracy in violation of the Hobbs Act and attempted bank robbery. A jury convicted them on both counts. Jett, McKissick, and Walker now appeal, citing a host of trial errors they submit require acquittal or a new trial. We see only one such error, with respect to the sufficiency of the evidence on the attempted-robbery count. We reverse and remand with instructions that the district court enter a judgment of acquittal on that count and resentence the defendants. Otherwise, we affirm.

## I. Background

On September 15, 2015, two men, disguised and armed, robbed an Advance America Check Cashing store in Indianapolis. A few days later, on September 19, 2015, the same men hit an Indiana Members Credit Union branch in Indianapolis. Two months later, on November 19, 2015, they robbed a different Credit Union branch, located in Avon, Indiana. Each time, the men arrived and fled in a recently stolen vehicle, or, as it is known, a "switch car."

A state-federal task force investigated the string of robberies. It fielded an anonymous tip claiming one of the two men was Damion McKissick. The task force began surveilling McKissick, which led it to Duprece Jett. While observing Jett and McKissick on the morning of December 12, 2015, officers observed four cars at Jett's residence. Two cars left the residence and headed to a public library. At the library one driver exited his car and entered a Buick LeSabre, which was recently reported stolen. All three cars drove away together.

The three cars made several stops: a hotel, Jett's residence, a gas station, and an apartment-complex parking lot. The

LeSabre then left the parking lot alone, and it drove near several businesses—including an Indiana Members Credit Union branch—before returning. Officers suspected that a fourth robbery was imminent. After the LeSabre left the parking lot a second time, again alone, officers attempted to pull it over. The LeSabre sped off and the officers gave chase. After exceeding 100 miles per hour, weaving through streets, forcing vehicles off the road, and driving into oncoming traffic, the LeSabre lost control and slid into a ditch. Its driver, Earl Walker, and passenger, McKissick, attempted to run on foot, but officers apprehended them. Officers searched the LeSabre and found a ski mask, two pairs of gloves, a backpack, a duffle bag, and an airsoft pistol.

The government charged Jett, McKissick, and Walker with two counts each. Count 1 charged conspiracy in violation of the Hobbs Act. 18 U.S.C. § 1951(a). Count 2 charged attempted bank robbery "by force and violence, or by intimidation." *Id.* § 2113(a).

## A. Pretrial Proceedings

Before trial, Walker moved under Federal Rule of Criminal Procedure 14(a) for a severance. He argued that a joint trial with Jett and McKissick would prejudice him. In addition to the optics of being tried alongside the men accused of committing the three armed robberies, Walker claimed that a video recording taken of McKissick at the stationhouse would unfairly inculpate him.

Specifically, at the stationhouse just after the car chase, law enforcement placed McKissick and Walker in adjacent interrogation rooms. Walker invoked his Fifth Amendment rights; McKissick gave a recorded statement. While McKissick

awaited questioning, and while being recorded, he attempted
to communicate with Walker. He shouted:

> Hey Earl! Earl! Nothing … joyriding … fleeing.
>
> Hey Earl! Hey Bro
>
> They jumped the gun. I say they jumped the gun. We ain't
> do shit. They didn't give us a chance. So—hey—uhh**.**

Walker argued that these statements incriminated him. He
also contended that admitting the statements would pit his
Sixth Amendment right to confrontation against McKissick's
Fifth Amendment right not to testify, which *Bruton v. United
States*, 391 U.S. 123 (1968), generally prohibits.

The district judge denied Walker's motion. She ruled that
a joint trial itself would not unfairly prejudice Walker, and she
explained that Walker's *Bruton* concerns were premature: the
statements did not appear "powerfully incriminating," the
government had not moved to admit the statements, and,
even if it did, the government could redact the statements to
avoid implicating Walker. Following suit, the government
later moved *in limine* to admit a scrubbed video recording of
the statements with Walker's name omitted. The district
judge granted that motion and admitted the statements under
Federal Rule of Evidence 801(d)(2)(A) as statements offered
against a party-opponent.

Just before trial began, the parties exchanged witness lists.
The government's list included two FBI Special Agents—
Adam Vail and Brian Guy—but it did not indicate whether
those witnesses (or any witnesses) would testify in a lay ca-
pacity, an expert one, or both. This procedure was in line with

the district judge's former courtroom rule that she would not designate a witness as an expert.[1]

## B. The Trial and Sentencing

The jury trial began on February 6, 2017, and lasted five days. The government elicited testimony from several employees of the check-and-cash stores and FBI agents, as well as admitted into evidence surveillance footage from the three robberies.

As for the September 15 robbery, an Advance America employee testified that two men entered wearing sunglasses, wigs, and construction jackets. One man was heavy set and the other was thin, according to the witness. Surveillance footage confirmed this description. The heavier man was dressed as funk legend Rick James, with a braided, beaded wig and flashy sunglasses; the thinner man was dressed, seemingly, as Youngblood Priest from the 1972 hit film *Super Fly*, with a long-haired wig, mustache, and oversized sunglasses of his own. Both men wore bright orange construction vests. The government called a man who worked with Jett at a logistics company to testify that the construction jackets the men wore were identical to the ones issued to the company's employees. An FBI agent, Kevin Horan, testified that he analyzed Jett's and McKissick's cell-phone data from September 15, which indicated that both men were in the area of the Advance America around the time of the robbery. No eyewitness,

---

[1] The district judge appears to have changed this rule. It now states "the Court will designate and declare whether a witness is an expert." We commend this change, for reasons we explain below. *See also United States v. Tingle*, 880 F.3d 850, 854 (7th Cir. 2018).

however, could identify Jett or McKissick as the robbers. The men made off with $2,751.

Regarding the September 19 robbery, a Credit Union branch manager testified that, after the two men entered, one hopped over the teller desk. He pointed a gun and told everyone to get down. She observed that the men wore hats and wigs, but she otherwise did not "get a good look at" the men. Surveillance footage again showed the men dressed as Rick James and Youngblood Priest. Another employee testified that he saw one of the men grab a Credit Union employee by the neck and threaten him. He, too, could not identify Jett or McKissick as the robbers. None of the government's eyewitnesses could.

Jett's counsel tried to highlight this point during his cross-examination of Agent Guy. He asked whether it was true that the investigation had "uncovered" no one who could identify either Jett or McKissick as the robbers. Agent Guy disagreed, but he did not elaborate. Before redirect, the government requested a sidebar. It argued that Jett's questioning had opened the door for Agent Guy to identify Jett as one of the two men in the surveillance footage based on Agent Guy's interaction with Jett on December 14, 2015, when he helped execute a search warrant. The government also contended that Agent Guy's identification was admissible under Federal Rule of Evidence 701, as he could testify that Jett's appearance had changed since late 2015 by losing weight. The district judge agreed on both counts. She allowed the government to ask about whether Agent Guy—but not any other law-enforcement agents—had identified Jett as the robber based on the surveillance footage and testify to Jett's change in appearance. Back on the stand, Agent Guy testified that Jett

appeared to have lost weight and that, based on his earlier interaction with Jett, Jett was the robber pictured on tape with the beaded-hair wig.

The government put on more evidence regarding the September 19 robbery. A fingerprint examiner testified that she found a fingerprint on the Credit Union's exit door that matched Jett's, although she testified that she could not identify when the print was left. This concession mattered, since Jett banked at this Credit Union. Agent Horan testified that Jett's and McKissick's cell-phone data showed that both men were in the area of the Credit Union around the time of the September 19 robbery. This time, the men stole $19,001.61.

As for the final robbery, on November 19, an employee of the Avon Credit Union testified that two men with ski masks ran into the store. One of the masked men jumped over the teller desk. That man wore a pair of Nike Air Maxes similar to ones later found at Jett's residence, although law enforcement could not match Jett's shoes to a shoeprint lifted from the teller desk. Another witness testified that one of the two men hit an employee in the head with his gun and demanded that she get into the vault. An employee opened the vault—which housed a cash-dispensing machine and containers of money—and showed McKissick how to open the containers. McKissick, while securing the cash, set down his weapon. A witness identified McKissick weapon's as a 1911-style semi-automatic airsoft pistol—which matched the pistol recovered from the LeSabre after the December 2015 car chase. Again, no witness could identify Jett or McKissick. Agent Horan, however, testified once more that Jett's and McKissick's cell-phone data confirmed that they were near the Credit Union in Avon around the time of the robbery. This robbery was the

most lucrative by far, with the robbers making off with over $109,000.

Aside from evidence of the three robberies, the government introduced evidence related to its surveillance of the defendants in December 2015. It admitted text messages between Jett and McKissick from the night of December 11, 2015, the night before the car chase. In the exchange, McKissick asked "when we going hunting"; Jett responded "Giv me a tym." Jett also messaged "where the screwdriver," "Ill handle the whip if u want," and "Fenna bounce." The government had Agent Vail, a case agent, interpret these text messages to the jury, over defendants' objections. Defense counsel argued that Agent Vail was not a party to the conversations and so he lacked personal knowledge of the texts' meaning. Nor could he offer expert testimony, defense counsel argued, because the text messages were written in English and did not require expertise to interpret. The district judge disagreed with the second point, noting that "looking at the jury" some jurors may not understand what some of the terms meant. Agent Vail told the jury, in essence, that these texts reflected Jett and McKissick's plan to steal another car.

The government also introduced evidence recovered after the car chase. The LeSabre's steering column, like that of an earlier-lifted car used during the robbery, had been disabled and hotwired. The items found in the LeSabre contained the defendants' DNA: McKissick's DNA was on the ski mask, backpack, and airsoft pistol; Walker's DNA was on the mask; and Jett's DNA was on the backpack. In addition, the jury saw the scrubbed video recording of McKissick's statements at the stationhouse. It heard another recording, too, of McKissick's post-arrest phone call with his wife. During that call,

McKissick told his wife "the mother fuckers jumped the gun." His wife responded, "you should have left well enough alone." An agent further explained that when the task force executed a search warrant at McKissick's residence, it found a tire filled with a backpack, gloves, and ski mask—all items used by the robbers—burned with accelerant in his backyard. Agents also found a duffle bag filled with Jett's possessions at McKissick's residence.

The government further admitted evidence of McKissick's cash usage in the fall of 2015. One witness, for example, testified that McKissick paid for a car on November 20—one day after the robbery in Avon—with a "big wad" of cash. Other evidence, mainly receipts, demonstrated McKissick's heavy cash use in this period. The government also introduced photographs from McKissick's phone in which he boasted large amounts of cash. McKissick countered this evidence, however, with receipts of his own. Namely, he presented evidence of cash payments to himself for copper resales and of a late November jackpot from a casino.

For Walker, the jury heard additional evidence from an FBI digital-evidence forensic examiner about data extracted from Walker's cell phone. That data showed internet searches for "Bank robbery Indianapolis," "Bank robbery Indianapolis 2015," and "rick james bank robber."

Before the close of evidence, the parties and the district judge discussed jury instructions. Defense counsel requested an instruction for the Hobbs Act conspiracy charge, which would have required the jury to find that the defendant committed an overt act to convict. Defense counsel also requested an instruction requiring the jury to agree unanimously as to

which overt act each defendant had committed. The district judge rejected these requests.

The jury found each defendant guilty on both counts. The district judge sentenced Jett and McKissick each to a total of 293 months in prison. Walker received 72 months total. This appeal followed.

## II. Discussion

Jett, McKissick, and Walker raise several challenges to purported errors in the district court, on topics including the sufficiency of the evidence, jury instructions, and the admission of certain expert and lay testimony. We address each challenge in turn.

### A. Sufficiency of the Evidence on the Attempted-Robbery Count

The defendants first argue there was insufficient evidence to convict on Count 2, which charged them with attempted robbery, 18 U.S.C. § 2113(a), for the events of December 12, 2015. Each defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) at the close of trial and the district judge denied those motions. We review those denials *de novo*. *United States v. Kohli*, 847 F.3d 483, 489 (7th Cir. 2017).

Section 2113(a) prohibits attempted robberies in two circumstances: (1) when the attempt is undertaken "by force and violence, or by intimidation"; or (2) when it results in the defendant entering or attempting to enter the targeted financial institution's premises. 18 U.S.C. § 2113(a). The jury in this case received instructions focusing on the first circumstance, which requires "actual" force or intimidation for a conviction. *United States v. Thornton*, 539 F.3d 741, 748 (7th Cir. 2008). No

such force or intimidation occurred on December 12, as the government concedes on appeal. Law enforcement arrested McKissick and Walker well before they had an opportunity to approach the Credit Union they planned to rob, and Jett never neared the Credit Union that day. (For those reasons, no conviction could lie under Section 2113(a)'s second circumstance either.) The evidence was therefore insufficient to convict on Count 2.

The only question left is the appropriate remedy. The defendants argue for a judgment of acquittal on Count 2, but the government suggests vacatur. We agree with the defendants. The Supreme Court instructs that an "evaluation of the evidence as insufficient to convict is equivalent to an acquittal and therefore bars a second prosecution for the same offense." *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 364 (2016). Because there was insufficient evidence on Count 2, a judgment of acquittal on that count must follow.

## B. Hobbs Act Conspiracy and the Overt-Act Requirement

The defendants' second challenge is to the district judge's refusal to instruct the jury that Count 1, which charged them with a conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951(a), required proof of an overt act in furtherance of the conspiracy. Because the district judge's decision stemmed from her interpretation of the law, we review it *de novo*. *United States v. Dessart*, 823 F.3d 395, 404 (7th Cir. 2016).

We have not yet decided whether a Hobbs Act conspiracy requires an overt act, though we have at least twice suggested that it does. In *United States v. Tuchow*, 768 F.2d 855, 869 (7th Cir. 1985), we said that, "[i]n order to establish a conspiracy, the government must prove that there was an agreement …

and that an overt act was committed in furtherance of the agreement by one of the coconspirators." We later quoted *Tuchow* in *United States v. Stodola*, 953 F.2d 266, 272 (7th Cir. 1992), for the same proposition. The defendants urge us to adhere to *Tuchow* and *Stodola*'s formulation, but we find little reason to do so. Those decisions mentioned the overt-act requirement "without discussion," a fact we recognized in *United States v. Corson*, 579 F.3d 804, 810 n.1 (7th Cir. 2009). We also recognized in *Corson* that other courts have expressly held that a Hobbs Act conspiracy does not have an overt-act requirement, although *Corson* did not require us to resolve the question. 579 F.3d at 810 n.1 (citing cases). This case, however, does.[2]

The answer to whether a conspiracy requires an overt act lies in the text of the statute that criminalizes the conspiracy. *United States v. Shabani*, 513 U.S. 10, 13–14 (1994), teaches, first, that "absent contrary indications, Congress intends to adopt the common law definition of statutory terms," and second, that "the common law understanding of conspiracy 'does not make the doing of any act other than the act of conspiring itself a condition of liability.'" These principles draw from *Nash v. United States*, 229 U.S. 373, 378 (1913), a decision which held that, because the text of 15 U.S.C. § 1 makes the act of conspiring the only condition of liability, an antitrust conspiracy under that section does not need an overt act. *Shabani* concerned a different conspiracy charge, one under 21 U.S.C. § 846. Applying *Nash*'s principles, the Court held that because Section 846's text does not mention an overt act, and because the law

_____

[2] Before issuing this opinion, we circulated it to the full court under Circuit Rule 40(e). No judge in active service requested to hear the case *en banc*.

does not infer an overt-act requirement from such "congressional silence," proof of a Section 846 conspiracy did not entail proof of an overt act. *Shabani*, 513 U.S. at 13–14. The *Shabani* Court found a comparison to the general conspiracy statute, 18 U.S.C. § 371, telling: Section 371, unlike Section 846, requires that a conspirator "do any act to effect the object of the conspiracy." *Id.* at 14 (quoting 18 U.S.C. § 371). That difference "speaks volumes," according to the Court. *Id.*

*Whitfield v. United States*, 543 U.S. 209 (2005), held similarly with respect to a money-laundering conspiracy charged under 18 U.S.C. § 1956(h). That statute, like the Sherman Act and Section 846, does not refer to an overt act, and so the Court ruled that one was not needed to prove a money-laundering conspiracy. *Whitfield*, 543 U.S. at 214. The Court repeated the rule of *Shabani*: Congress has a "formulary" and "by choosing a text modeled on § 371, it gets an overt-act requirement; by choosing a text modeled on the Sherman Act … it dispenses with such a requirement." *Id.*

*Shabani* and *Whitfield* dictate the conclusion that a Hobbs Act conspiracy does not have an overt-act requirement. The Hobbs Act reads:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts *or conspires so to do*, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added). Like the Sherman Act, Section 846, and Section 1956(h)—and unlike Section 371—the Hobbs Act does not say that conspirators must effect an overt

act before the conspiracy becomes punishable. *Whitfield*, 543 U.S. at 215. It makes the act of conspiring itself the crime. *See Shabani*, 513 U.S. at 13; *see also Corson*, 579 F.3d at 810. We therefore hold that an overt act is not an element of a Hobbs Act conspiracy. In so doing, we join every other court of appeals to have directly addressed the question after *Shabani*. *United States v. Salahuddin*, 765 F.3d 329, 338 (3d Cir. 2014); *United States v. Palmer*, 203 F.3d 55, 63 (1st Cir. 2000); *United States v. Pistone*, 177 F.3d 957, 959–60 (11th Cir. 1999) (per curiam); *see also United States v. Clemente*, 22 F.3d 477, 480 (2d Cir. 1994). Only one court of appeals, the Fifth Circuit, continues to state that the Hobbs Act contains an overt-act requirement. *See United States v. Harrell*, 629 F. App'x 603, 604–05 (5th Cir. 2015); *United States v. Herrera*, 466 F. App'x 409, 417 (5th Cir. 2012) (per curiam); *United States v. Box*, 50 F.3d 345, 349 (5th Cir. 1995). Like us before today, however, the Fifth Circuit has not considered the effect of *Shabani* and *Whitfield* on this formulation.

The district judge's decision not to instruct the jury on an overt-act requirement was proper. Because we so hold, we need not address the defendants' argument that the jury had to agree unanimously to each overt act.

## C. Agent Vail's Testimony

The defendants (primarily Jett and McKissick) next contest the district judge's admission of Agent Vail's testimony interpreting certain words in the text messages Jett and McKissick exchanged. The government offered this part of Agent Vail's testimony, unlike the rest of it, as an expert opinion under Federal Rule of Evidence 702. During this testimony, Agent Vail explained the meaning of certain slang terms—like "whip," "hunting," and "[f]enna bounce"—in

describing messages that, according to him, reflected Jett and McKissick's plan to steal a switch car. We review whether a district judge properly applied the Rule 702 framework *de novo*; if she did, we review the decision to admit or exclude expert testimony for an abuse of discretion. *United States v. Parkhurst*, 865 F.3d 509, 514 (7th Cir. 2017). Even an abuse of discretion, however, does not merit a new trial unless the error impacted the defendants' substantial rights. Fed. R. Crim. P. 52(a).

### 1. Admissibility Under Rule 702

The defendants first fault the district judge for not evaluating Agent Vail's expert testimony under Rule 702 and the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 and *Daubert* call upon a district judge to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. The defendants are correct that the district judge did not, by and large, make this assessment. But she had good reason: the defendants did not ask her to. District judges are not required to undertake each step of the Rule 702 analysis when no party specifically requests it, and they generally do not err in admitting expert testimony as a result. *United States v. Christian*, 673 F.3d 702, 711 n.1 (7th Cir. 2012); *United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008).

The defendants essentially concede that they failed to request that the judge engage in the Rule 702 analysis. Yet they offer a reason of their own: any such request would have been futile, they submit, in light of the district judge's former rule that she would not designate and declare expert witnesses as

such. That is no excuse. The judge's former rule said that she would not designate or declare an expert; it did not say that she would not undertake the Rule 702 analysis to determine the admissibility of expert testimony. Even if it had, futility does not generally free a litigant from his obligation to raise an objection in the first instance. *See Divane v. Krull Elec. Co.*, 194 F.3d 845, 849 (7th Cir. 1999).

The defendants did, however, object to Agent Vail's testimony on other grounds that they raise on appeal. For one, they contend that the interpretation of the slang terms Jett and McKissick used is not a subject for expert testimony. These words were within the jury's comprehension, they argue. "Whip," for example, is commonly understood as a car, and "fenna bounce" is known slang for "going to leave." Admitting Agent Vail's interpretation of these and other terms served only to give "expert gloss" to the government's narration of the text-message exchange, according to the defendants.

Courts may properly admit a case agent's expert testimony to help juries interpret the "key words" or "code words" used by individuals or groups that the agent investigates. *See, e.g.*, *Parkhurst*, 865 F.3d at 516; *United States v. Ceballos*, 302 F.3d 679, 687–88 (7th Cir. 2002). We caution, however, against conflating commonly used slang or vernacular with the code words of a criminal milieu. Once qualified, case agents may explain terms with which their professional experience has given them particular familiarity; they may not give interpretation to terms with which they are no more familiar than others. Those terms are properly left for the jury to evaluate on its own. *See United States v. York*, 572 F.3d 415,

423 (7th Cir. 2009); *United States v. de Soto*, 885 F.2d 354, 361 (7th Cir. 1989).

In this case, the experienced district judge made a specific finding in explaining that the jury before her may not have known or understood the slang terms Jett and McKissick used. "[L]ooking at [the] jury," she concluded, "they may not know" and "may not understand" what the terms meant. District judges are best positioned to make assessments like that, and so we cannot say it was an abuse of discretion to conclude that expert interpretation of the terms was helpful and the appropriate subject of expert opinion. Further, in eliciting this expert opinion, the government laid adequate foundation. *See Christian*, 673 F.3d at 713; *York*, 572 F.3d at 425. Agent Vail testified through his training and experience he knew of "slang terms that are used by individuals." In context, this meant that he, as a violent-crime investigator, was familiar with slang words used by the criminals he investigates.

Even if the district judge abused her discretion in admitting this limited expert testimony, it was harmless error. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Stewart*, 902 F.3d 664, 683 (7th Cir. 2018) (citation omitted). The evidence against Jett and McKissick on Count 1 was plenty persuasive without Agent Vail's interpretation of the text messages. The government needed only to prove that they conspired to commit bank robbery, and it admitted surveillance footage that a jury could easily conclude showed Jett and McKissick actually committing the bank robberies together. Cell-phone data further confirmed that both men were in the area of the check-and-cash locations around

the times they were robbed. The government also introduced evidence of burned items matching what the robbers used at McKissick's home and McKissick's incriminating statements at the stationhouse.

What is more, Agent Vail's testimony was limited and defense counsel had the opportunity to cross-examine him on his qualifications to opine on slang terms (though they chose not to), a fact the district judge made clear in admitting his testimony. Still more, the defendants have identified nothing wrong, misleading, or disputable in Agent Vail's testimony. In fact, he interpreted the slang terms—"whip" as "automobile," for example—in the same way the defendants suggest they are commonly understood. We therefore find no reversible error in the admission of Agent Vail's testimony as expert opinion.

### 2. Admissibility as Dual-Role Testimony

The defendants make a related argument about Agent Vail's testimony. Even if Agent Vail's testimony was proper under Rule 702, they argue, it was improperly intertwined with his lay testimony.

We have allowed the practice of permitting case agents to testify as both fact and expert witnesses. *See Parkhurst*, 865 F.3d at 519; *United States v. Lightfoot*, 224 F.3d 586, 589 (7th Cir. 2013); *but see United States v. Garrett*, 757 F.3d 560, 569 (7th Cir. 2014) (cautioning against the practice). At the same time, we have repeatedly warned of the "inherent dangers" of such dual-role testimony. *United States v. Cheek*, 740 F.3d 440, 447 (7th Cir. 2014); *United States v. Tucker*, 714 F.3d 1006, 1016 (7th Cir. 2013); *York*, 572 F.3d at 425. These dangers include the risk that a jury may "unduly credit the opinion testimony" due to

a "perception that the expert was privy to facts about the de-
fendant not presented at trial" or the risk that the jury may
"be smitten by an expert's 'aura of special reliability.'" *Cheek*,
740 F.3d at 447 (quoting *York*, 572 F.3d at 425); *see also Garrett*,
757 F.3d at 569. Most often, however, we have cited the risk
that dual-role testimony could confuse the jury. *E.g.*,
*Parkhurst*, 865 F.3d at 519; *Christian*, 673 F.3d at 713; *York*, 572
F.3d at 425–26.

Agent Vail's testimony never made clear whether his in-
terpretation of the text messages was based on his expert
opinion, personal knowledge, or both. Agent Vail took the
stand twice at trial. The first time, he testified only about lay
matters within his personal knowledge as case agent: his
DNA swabbing of the defendants and the recordings of
McKissick. The second time, he began again with lay testi-
mony regarding fingerprinting, his analysis of one of the
switch cars, observations of the defendants during his surveil-
lance, and items recovered after the car chase. The govern-
ment then began to elicit Agent Vail's expert testimony re-
garding the text messages without any sign that he was going
to offer expert opinions.

After the government attempted to qualify Agent Vail to
interpret those messages, it asked whether he "had
knowledge of what occurred on December 12, 2015," to which
Agent Vail responded "Yes." The government then asked,
"And so you can give context to these messages; is that cor-
rect," to which Agent Vail responded, "That's correct." The
testimony thus could have led an objective viewer to think
Agent Vail's personal knowledge of the December 12 events
formed the basis for his interpretation of the text-messages,
not any professional expertise.

The water got muddier when defense counsel objected again to the dual-role testimony.

> [DEFENSE COUNSEL]: So is he saying he knows these terms from being an expert in the area or because he's the case agent?
>
> THE COURT: Well, let's find out. Would you inquire?
>
> Q: Are you giving your knowledge because you're an expert or your – based on your knowledge as the case agent?
>
> A: *Based on my knowledge as the case agent.*
>
> [DEFENSE COUNSEL]: That's why he can't give those interpretations.
>
> THE COURT: Well, you have also said he – this was his area of expertise; is that correct?
>
> Q: Would you also say that – you do violent crimes for a living, is that correct, you investigate them?
>
> A: It is correct that I am an FBI agent and I investigate violent crimes, yes.

This suggested that Agent Vail would explain the text messages in his personal, not expert, capacity. When questioning resumed after a sidebar, the government elicited no clarification.

District judges must take precautions to avoid admitting this sort of confusing dual-role testimony. *E.g.*, *Parkhurst*, 865 F.3d at 518–19; *United States v. Causey*, 748 F.3d 310, 320 (7th Cir. 2014). The government did not structure Agent Vail's testimony to make clear when he was offering lay testimony and when he was offering expert opinions. *See Tucker*, 714 F.3d at 1016; *York*, 572 F.3d at 425. The district judge did not inform the jury about the differences in the types of testimony Agent Vail offered. *See Christian*, 673 F.3d at 712–13; *York*, 572 F.3d at

426. The district judge's former rule, in fact, precluded the designation of expert testimony in front of the jury. The government's foundational question, especially given the murkiness of the questioning that followed, offered little clarity into the differences between Agent Vail's expert opinions and lay testimony. *See Causey*, 748 F.3d at 320.

The jury instructions provided no clarity either. The jury received two forms of Pattern Criminal Jury Instruction 3.13, which accurately tells the jurors that they do not have to accept a witness's opinion testimony and that they should evaluate such testimony based on the witness's qualifications, methodology, and other factors. There are two problems with the application of that instruction to Agent Vail's dual-role testimony: First, neither form indicated that Agent Vail offered opinion testimony. *Cf. Parkhurst*, 865 F.3d at 519 (holding that Pattern Instruction 3.13 was an appropriate precaution where it identified the witness who offered the opinion testimony); *United States v. Moreland*, 703 F.3d 976, 984 (7th Cir. 2012) (holding the same for a similar instruction given while the agent was on the stand). Second, this instruction is meant for witnesses testifying only in one capacity. It does not purport to help mitigate the risks caused by dual-role testimony. *Parkhurst*, 865 F.3d at 525 (Easterbrook, J., concurring).

With that said, we recognize a shortcoming in our caselaw. We have been clear that some general precautions are needed to limit the risks of dual-role testimony. But we have been unclear on specifics. Our caselaw, for one, has not expressly addressed what a proper dual-role instruction should look like. More importantly, it has been inconsistent about how district judges should structure dual-role testimony and distinguish

the differences for the jury. *See id.* at 524–26. In *Christian*, we stated:

> The jury needs to know when an agent is testifying as an expert and when he is testifying as a fact witness…. To take the necessary precautions, the court can give an appropriate cautionary instruction and require examination of the witness in such a way as to make clear when the witness is testifying to fact and when he is offering his opinion as an expert.

673 F.3d at 712–13 (quotations and citations omitted). In *Moreland*, we said the opposite:

> Telling the jury that a witness is both a lay witness and an expert witness and will be alternating between the two roles is potentially confusing—and unnecessary. The lawyer examining the witness need only ask him the basis for his answer to a question, and the witness will then explain whether it was his investigation … or his general experience …. That tells the jury what it needs to know in order to determine how much weight to give the testimony and tells opposing counsel what he needs to know in order to be able to cross-examine the witness effectively. Using terms like "lay witness" and "expert witness" and trying to explain to the jury the difference between the two types of witness is inessential and, it seems to us, ill advised.

703 F.3d at 983–84. As our colleague Judge Easterbrook has explained in a concurrence, *Christian* and *Moreland*'s "tension cannot endure indefinitely." *Parkhurst*, 865 F.3d at 525 (Easterbrook, J., concurring).

This case offers an opportunity to clarify.[3] When a district judge learns that the government intends to put on dual-role testimony from a case agent, it should first encourage the government to present the expert and lay testimony separately. "Seamlessly switching back-and-forth between expert and fact testimony does little to stem the risks associated with dual-role witnesses." *United States v. Jones*, 763 F.3d 777, 803 (7th Cir. 2014), *vacated on other grounds sub nom. United States v. Drake*, 774 F.3d 1104 (7th Cir. 2014); *Moreland*, 703 F.3d at 983; *Christian*, 673 F.3d at 713; *York*, 572 F.3d at 426. Indeed, juries must parse what they should evaluate based on the witness's personal knowledge (lay testimony, *see* Fed. R. Evid. 701) from what they should evaluate based on the witness's qualifications, training, and methods (expert testimony, *see* Fed. R. Evid. 702). A witness who careens from one type of testimony to the other makes that task particularly challenging.

When the expert portion of the case agent's testimony begins, the district judge should allow the government to lay its foundation and establish the agent's qualifications. After it does, the district judge should instruct the jury that the testimony it is about to hear is the witness's opinion based on training and experience, not firsthand knowledge, and that it is for the jury to determine how much weight, if any, to give that opinion. *See Christian*, 673 F.3d at 712–13; *York*, 572 F.3d at 426. Using the phrase "expert testimony" is not important. *See Garrett*, 757 F.3d at 569–70; *Moreland*, 703 F.3d at 984. What is important is ensuring that the jury understands that the

---

[3] For this matter also, we circulated this opinion to the full court under Circuit Rule 40(e) before issuing it. No judge in active service requested to hear the case *en banc*.

testimony is different, and should be evaluated differently, from the agent's other testimony.

That leaves the appropriate jury instruction. *Parkhurst* accepted a version of Pattern Instruction 3.13 (one that identified the agent as offering opinion testimony) as a precautionary measure for dual-role testimony. A different instruction, though, is more helpful. In *Garrett*, we approved the following instruction aimed at curbing the risks of dual-role testimony:

> You have heard the testimony of [an agent], who testified to both facts and opinions. Each of these types of testimony should be given the proper weight.

> As to the testimony to facts, consider the factors discussed earlier in these instructions ... As to the testimony on opinions, you do not have to accept [the agent's] opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how he reached his conclusions along with the other factors discussed in these instructions for weighing the credibility of witnesses.

757 F.3d at 570. This formulation, or something similar, better informs the jury of its task—to weigh expert testimony and lay testimony separately, under their respective standards.[4]

The procedures for properly admitting dual-role testimony were not followed in this case. *See United States v. Parra*,

---

[4] We encourage the Committee on Pattern Criminal Jury Instructions of the Seventh Circuit to consider adding a pattern instruction to this effect. We also encourage the Committee to consider Judge Easterbrook's proposal from *Parkhurst* that an agent's "special knowledge about [expert subject] does not make his testimony about [lay subject] more reliable than that of any other witness." 865 F.3d at 525. This suggestion rightly attempts to mitigate the long-recognized risk that a jury could afford undue weight to an agent's testimony because he expresses expert opinions.

402 F.3d 752, 759 (7th Cir. 2005). The admission of Agent Vail's testimony, however, was harmless error. Even disregarding Agent Vail's limited expert testimony, the jury heard and saw convincing evidence of Jett's and McKissick's guilt: footage surveillance of two men, dead ringers for Jett and McKissick, robbing the check-and-cash stores; confirmatory cell-phone data; incinerated evidence at McKissick's home; testimony about the high-speed chase; and McKissick's incriminating stationhouse statements. While we encourage district judges to use precautions like those described above in admitting a case agent's dual-role testimony, we find no reversible error here.

### D. Agent Guy's Testimony

The defendants (led by Jett) also contend that Agent Guy's identification of Jett as one of the robbers requires a new trial. We review the district judge's decision to admit evidence for an abuse of discretion. *United States v. Quiroz*, 874 F.3d 562, 569 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1450 (2018). Again, we order a new trial only if an error affected the defendant's substantial rights. *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017).

The district judge permitted Agent Guy's identification on two grounds: the open-door doctrine and Rule 701. Under the open-door doctrine, when a party puts an issue into evidence it must accept its opponent's commensurate response. *Estate of Escobedo v. Martin*, 702 F.3d 388, 400–01 (7th Cir. 2012). The gist of the doctrine is proportionality and fairness. When the opponent's response "does not directly contradict the evidence previously received" or "goes beyond the necessity of removing prejudice in the interest of fairness," it should not be admitted. *United States v. Amaya*, 828 F.3d 518, 527 (7th Cir.

2016) (quoting *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011)). Under Rule 701, a witness can match a defendant to surveillance footage only if there is a basis for concluding that the witness "is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011) (quoting *United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990)). When the same match can be made by the jury, "the witness is superfluous" and the testimony should not be admitted. *United States v. Earls*, 704 F.3d 466, 472 (7th Cir. 2012).

The admission of Agent Guy's identification was an aggressive application of both the open-door doctrine and Rule 701. Taking the open-door doctrine first, defense counsel's cross-examination of Agent Guy entailed the following:

> Q: Is it fair to say, Agent – Special Agent Guy, that throughout your involvement in the investigation, and your knowledge of the investigation from September 19th, 2015, the date of the robbery of the Wesleyan Road credit union, up until the end of the investigation you've discovered no person who can identify my client, Duprece Jett, as having robbed them, correct?
>
> A: Could you restate the question?
>
> Q: Yes. You've uncovered no person who can specifically identify Durprece Jett as being one of the robbers?
>
> A: Well, I disagree with you.
>
> Q: Okay. Were you involved in the photo spreads that were shown to witnesses from the bank?
>
> A: No.

The restated question, like the earlier question, plainly sought to bring out that the government had not identified an

*eyewitness* who could identify either Jett or McKissick as the robbers. To interpret the question to include *agents* is inconsistent with its context and a reasonable understanding of the word "uncovered" (for agents "uncover" evidence and witnesses, not themselves). Defense counsel may have asked an inarticulate question or even a "bad" one, as the district judge put it. But it was not so bad as to effectively put into issue whether a case agent thought that Jett was the man on camera. Even if the agent's interpretation was an innocent misunderstanding, allowing his response to let in the government's own identification of Jett as the robber was neither proportional nor fair.[5] *See Amaya*, 828 F.3d at 527.

We doubt that Rule 701 provided any more stable ground for admitting Agent Guy's identification of Jett. The government represented that Agent Guy's observations while executing the search warrant would be helpful to the jury because Jett had "lost a little bit of weight" since then. On the stand, Agent Guy testified:

> Q: Okay. And after those personal observations, does Mr. Jett look exactly today like he did back then, or has anything changed?

> A: He looks a little thinner. Otherwise – his facial hair is a little different. He still has his mustache; and his facial hair; where it grows out, is the same. If he stood up, I would see his body type. He was a little heavier, I think.

---

[5] We appreciate the district judge's decision to limit Agent Guy's testimony to his own identification and not those of his colleagues. We nevertheless reject that defense counsel opened the door in the first place.

Agent Guy testified further that he was at the execution of the
search warrant for "[n]ot long." He did not otherwise detail
the length or manner of his interaction with Jett.

This is not the sort of familiarity with a defendant that we
have generally thought helpful to a jury under Rule 701. *See
United States v. Stormer*, 938 F.2d 759, 762 (7th Cir. 1991) (wit-
ness had "worked with [the defendant] for several years");
*Towns*, 913 F.2d at 445 (witness was the defendant's former
girlfriend who had a "close association with him"). Granted,
our cases have said that a witness's experience with the de-
fendant need not be lengthy and the defendant need not nec-
essarily undergo physical changes for a witness's lay identifi-
cation to be helpful. *United States v. Jackson*, 688 F.2d 1121,
1125 (7th Cir. 1982); *White*, 639 F.3d at 336. But given Agent
Guy's fleeting interaction with Jett and Jett's minimal (at best)
difference in appearance, we cannot conclude that Agent
Guy's identification assisted the jury.

Regardless of whether the district judge's admission of the
identification was an abuse of discretion, however, we again
find harmless error. The jurors observed the surveillance foot-
age on their own. They received the proper instruction re-
garding the weight they should give to testimony, and de-
fense counsel's cross-examination of Agent Guy made clear
that his identification was only his opinion. Our conclusion
from *Jackson* is apt: "The jury was free to believe or disregard
[the witness's] testimony; the issue of whether the defendant
was the same person as the bank robber was left to the jury
for its ultimate determination." *Jackson*, 688 F.2d at 1126. Com-
pounding the incriminating surveillance footage, the jury
learned that cell-phone data put Jett and McKissick near the
robberies. They also learned that Jett's DNA was found in the

stolen LeSabre. The government's case, therefore, would not have been significantly less persuasive without Agent Guy's testimony.

This conclusion is unaltered by the fact that the government referenced Agent Guy's identification in its closing arguments. Those comments certainly did not rise to prosecutorial misconduct, which we would review for plain error since Jett did not object to them below. The comments were not "improper" in light of the district judge's ruling on the evidence and, harmless as that ruling was, the comments did not deprive Jett (or any defendant) of a fair trial. *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016). The government merely told the jury that it could use Agent Guy's identification to "help" the jury in making its own decision. If there was any doubt about the limits of Agent Guy's identification, defense counsel disabused it during his closing in arguing that the jury could not defer to Agent Guy and needed to make its own decision.

Nor was there cumulative error. The evidence we have identified as sufficiently and persuasively incriminating—the footage, the cell-phone data, the DNA—would be admitted even if each of the defendants' arguments were correct.

### E.  Remaining Arguments Unique to Walker

The remaining issues on appeal are unique to Walker. He asserts that there was insufficient evidence to convict him for conspiracy, that the district judge violated *Bruton* by admitting the recording of McKissick at the stationhouse, and that the district judge erred in denying his motion for severance.

### 1. Sufficiency of the Evidence on the Hobbs Act Conspiracy Count

Walker contends the "fate" of the attempted robbery count "dooms" the Hobbs Act conspiracy count. We overturn a jury verdict only if, after viewing the facts in the light most favorable to the government, there was insufficient evidence to convict. *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (citation omitted). A defendant bears the burden to "convince" the court that "no rational trier of fact could have found him guilty." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (citation omitted). It is a "heavy" burden—indeed a "nearly insurmountable" one. *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018) (citation omitted).

A conviction for a Hobbs Act conspiracy requires proof beyond a reasonable doubt that the conspiracy existed and that the defendant joined it with the intent to advance its objectives. *See Corson*, 579 F.3d at 810. That a defendant joins the conspiracy well after its inception is no matter. *United States v. Brown*, 865 F.3d 566, 570 (7th Cir. 2017), *cert. denied sub nom. Hawthorne v. United States*, 138 S. Ct. 2005 (2018); *United States v. Arrellano*, 757 F.3d 623, 634 (7th Cir. 2014). Direct evidence of intent to join the conspiracy is not required; circumstantial evidence may suffice. *United States v. Goree*, 756 F.3d 522, 525 (7th Cir. 2014).

The government presented sufficient evidence to convict Walker of conspiracy. He was caught with a coconspirator circling a cash-and-check store (the conspiracy's preferred target), in a stolen car (the conspiracy's modus operandi), with a duffle bag and ski mask in the car (the conspiracy's tools). When law enforcement attempted to pull Walker over, he evidenced guilt by leading them on a high-speed and dangerous

chase. *See, e.g.*, *United States v. Stevenson*, 656 F.3d 747, 752 (7th Cir. 2011); *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998). His cell-phone data suggested that he had an interest in the robberies, as he searched them on the internet. These facts are in stark contrast to the cases in which an individual was merely present during conspiratorial acts. *See, e.g.*, *United States v. Baker*, 499 F.2d 845, 848–49 (7th Cir. 1974). A rational jury could have convicted based on this evidence.

The real rub of Walker's argument is that the reversal of his Count 2 conviction requires reversal of his Count 1 conviction. He presses that without the attempted robbery conviction the conspiracy conviction is "gutted." That argument reflects a misunderstanding of what is required to prove an inchoate offense. Conspiracy is an inchoate offense, "the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). The fact that the unlawful act—or another inchoate step (like attempt) toward the unlawful act—is not achieved does not undermine a conspiracy conviction under the Hobbs Act. "The crime of conspiracy is the agreement itself." *Corson*, 579 F.3d at 804.

The two cases upon which Walker relies are inapposite. In the first, *United States v. Buffington*, 815 F.2d 1292, 1303 (9th Cir. 1987), the Ninth Circuit reversed both an attempt and conspiracy charge for the same reason: a lack of sufficient evidence regarding intent. The reversal of the attempt conviction did not necessitate a reversal on the conspiracy conviction; a lack of evidence that the defendants intended to rob the bank required the reversal of both. *Buffington*, 815 F.2d at 1303. Here, however, the reasons for setting aside the attempt conviction (a lack of force or intimidation) do not speak to the sufficiency of the conspiracy conviction. In the second case,

*United States v. Thornton*, 539 F.3d 741, 751 (7th Cir. 2008), we
reversed a conviction for attempted robbery based on a lack
of proof of intimidation (like here). In so doing, we necessarily
had to reverse the attendant 18 U.S.C. § 924(c)(1)(A) convic-
tion for a lack of the statutorily required predicate crime of
violence. *Thornton*, 539 F.3d at 751. A Hobbs Act conspiracy,
on the other hand, is not predicated on anything but the
agreement to commit robbery. *Corson*, 579 F.3d at 810.

### 2.  *Bruton* **Challenge**

Walker also argues that the scrubbed video recording of
McKissick's statements at the stationhouse violated his Sixth
Amendment right to confrontation under *Bruton*. The record-
ing showed (with redactions crossed out) McKissick saying:

> ~~Hey Earl! Earl!~~ Nothing … joyriding … fleeing.

> ~~Hey Earl! Hey Bro~~

> They jumped the gun. I say they jumped the gun. We ain't
> do shit. They didn't give us a chance. ~~So—hey—uhh.~~

The district judge admitted this recording as a statement by a
party opponent (McKissick) pursuant to Rule 801(d)(2)(A).[6]
At trial, Agent Guy explained that McKissick made these
statements sitting alone in an interrogation room. We review
*de novo* a court's application of *Bruton*. *United States v. Javell*,
695 F.3d 707, 710 (7th Cir. 2012).

In *Bruton*, the government introduced at trial the confes-
sion of a codefendant which expressly implicated the defend-
ant in a crime. *Bruton*, 391 U.S. at 124. Even though the trial

---

[6] The district judge correctly rejected the government's argument that
McKissick made these statements in furtherance of the conspiracy. *See*
Fed. R. Evid. 801(d)(2)(E).

judge instructed the jury to consider the statement only as evidence against the codefendant, the Supreme Court held that the statement violated the defendant's right under the Confrontation Clause because the defendant could not subject his codefendant to cross-examination. *Id.* at 137. It explained further that "powerfully incriminating extrajudicial statements of a codefendant," like the confession of a codefendant, are generally inadmissible, even with a proper jury instruction. *Id.* at 135–36.

The Court later refined *Bruton*'s reach in *Richardson v. Marsh*, 481 U.S. 200 (1987). *Richardson* held that the admission of a nontestifying codefendant's confession does not violate a defendant's right to confrontation if (1) the confession is redacted to "to eliminate not only the defendant's name, but any reference to his or her existence" and (2) the trial court provides a proper limiting instruction. 481 U.S. at 211; *see also United States v. Ward*, 377 F.3d 671, 676–77 (7th Cir. 2005); *United States v. Sutton*, 337 F.3d 792, 799 (7th Cir. 2003). The Supreme Court then clarified in *Gray v. Maryland*, 523 U.S. 185, 192 (1998), that the redactions must not be so "obvious" so as to "closely" resemble an unredacted statement. This, the Supreme Court reasoned, is because a jury can directly infer from such "obvious" redactions "that the confession refers specifically to the defendant." *Id.* at 193.

Following *Bruton*, *Richardson*, and *Gray*, we have concluded that a defendant's "redacted confession may be admitted as long as the redaction does not obviously refer to the codefendants." *United States v. Hernandez*, 330 F.3d 964, 973 (7th Cir. 2003); *see also Javell*, 695 F.3d at 712. If a codefendant's confession incriminates the defendant only "when linked with evidence introduced later at trial," a limiting instruction

suffices to protect the defendant's rights. *United States v. Mansoori*, 304 F.3d 635, 663 (7th Cir. 2002) (quoting *Richardson*, 481 U.S. at 208).

Walker does not have a valid *Bruton* claim. The scrubbed video recording did not obviously refer to Walker. It shows McKissick sitting alone in a room surrounded by cement walls. The jury received the proper limiting instruction, stating that it could not consider the statement of McKissick as evidence against Walker or Jett. There is therefore no *Bruton* problem. *See Mansoori*, 304 F.3d at 663. Walker, nevertheless, argues that the video recording was incriminating because the jury could have concluded that McKissick and Walker were detained in the same stationhouse after the car chase. Yet the video recording does not suggest that McKissick and Walker were detained near one another (again it shows only McKissick alone in a room with cement walls), and so Walker's argument works only "when linked" with the trial's other evidence. *Richardson*, 481 U.S at 208. Any potential prejudice that such inferential linking caused was cured by the instruction. *See Mansoori*, 304 F.3d at 663.

In any event, the Supreme Court has drawn a distinction between statements that are "facially incriminating" and those that are "inferential[ly] incriminat[ing]." *Gray*, 523 U.S. at 196. Indeed *Bruton*, *Gray*, and *Richardson* each concerned "confessions." *See Javell*, 695 F.3d at 710–12. Though suggestive, McKissick's statements are not so facially and "powerfully incriminating" as to be considered a confession. *See United States v. Volpendesto*, 746 F.3d 273, 291 (7th Cir. 2014). Nor can it be said that McKissick's statements, as scrubbed, even "indirectly implicated" Walker. *Javell*, 695 F.3d at 712. Walker does not argue that the redactions themselves leave

the impression that McKissick was attempting to communicate with, and therefore implicate, someone else—which was *Gray*'s concern. While the jury may have assumed that the two were at the same stationhouse, it is a stretch to assume that the jury understood that they sat in adjacent rooms and that McKissick was attempting to communicate with Walker.

### 3. Motion to Sever

Finally, Walker protests the district judge's denial of his motion to sever, which he renewed at the close of evidence. District judges have "wide discretion in determining when the prejudice of joinder outweighs the benefits of a single trial." *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006). We therefore review denials of motions to sever for abuse of discretion. *United States v. Jackson*, 787 F.3d 1153, 1158 (7th Cir. 2015).

Rule 14(a) permits a court to sever codefendants' trials when "consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). In moving under Rule 14(a), a defendant must show a "serious risk" that a joint trial will "compromise a specific trial right" or "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The risk of prejudice is heightened when a defendant is distinctly less culpable than his codefendants. *Id.* at 540. A defendant, however, is not entitled to severance simply because his chances of acquittal are higher in a separate trial. *Id.* On the contrary, the prevailing preference is that codefendants be tried together. *United States v. Goodwin*, 496 F.3d 636, 644 (7th Cir. 2007). That preference is especially strong for coconspirators who are indicted together. *United States v. Maggard*, 865 F.3d 960, 971 (7th Cir. 2017), *cert. denied sub nom. Bell v. United*

*States*, 138 S. Ct. 2014 (2018); *United States v. Spagnola*, 632 F.3d 981, 987 (7th Cir. 2011).

Walker cannot overcome this preference. While he complains of the "inflammatory evidence" about Jett and McKissick's robberies, which occurred before he joined the conspiracy, that evidence would likely have been admissible against him anyway. *See, e.g.*, *United States v. Arrellano*, 757 F.3d 623, 634 (7th Cir. 2014) (explaining that a conspiracy's latecomer adopts "the previous acts and declarations of his fellow co-conspirators") (emphasis and citation omitted). Walker also complains about the "atrocious" nature of his co-conspirators' conduct, and he argues that it deprived him of a right to a fair trial. That argument has at least two flaws. First, there is no reason to think that the jury convicted the defendants out of animus for their violence, as opposed to based on an objective evaluation of the evidence and the district judge's instructions on the law. Second, Walker agreed (the evidence showed) to join that violent conspiracy and *his own* conduct endangered plenty of lives in its own right, as he led law enforcement on a high-speed chase at times heading in the wrong direction of traffic.

### III. Conclusion

For these reasons, we REVERSE and REMAND with instructions that the district court enter a judgment of acquittal for each defendant with respect to Count 2 and resentence each defendant accordingly. We otherwise AFFIRM the district court's judgment.