In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 21-1521, 21-2618, & 21-2689

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC BARD, CARLO PAYNE,
and ANTONIO MCCLURE,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cr-00029-JRS-DML — **James R. Sweeney II**, *Judge.*

———————————

ARGUED NOVEMBER 28, 2022 — DECIDED JULY 10, 2023

———————————

Before ROVNER, ST. EVE, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* In early 2018, law enforcement began investigating an Indianapolis drug trafficking organization led by Jshaun Trice. The investigation led to the indictments of Trice and over twenty of his associates for crimes including drug conspiracy, possession, and distribution. Antonio McClure and Carlo Payne, two of Trice's associates, were arrested following a drug surveillance operation on

October 21, 2018. Law enforcement intercepted a phone call between McClure and Trice during which they spoke in coded language suggestive of a drug deal. Officers later observed McClure and Payne meet with Trice and pursued Payne in a high-speed chase during which he threw a sock containing 214.2 grams of methamphetamine out of his car window. Payne and McClure later discussed these events in detail on a recorded jail call. Both were charged as part of the drug conspiracy and with purchasing 50 grams or more of methamphetamine from Trice for the purpose of distribution, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(viii). The government eventually dropped the conspiracy charge as to McClure and Payne. Both defendants went to trial on the remaining count and were convicted of possession of methamphetamine with intent to distribute.

McClure and Payne raise three categories of arguments on appeal. First, they argue that the government impermissibly struck a Black potential juror in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). They argue that the government's explanation for striking this juror—that he had a brother with a drug dealing conviction—was pretext because some white jurors who were not stricken also had relatives who had been involved with drugs. Second, they argue that the district court erred in permitting Detective Jason Hart to offer both expert and lay opinions at trial, and that the court failed to adequately instruct the jury as to his dual-role testimony according to the guidelines set forth in *United States v. Jett*, 908 F.3d 252 (7th Cir. 2018). Third, they contend that the evidence supporting their convictions was legally insufficient. We take each argument in turn, filling in the facts as we go. Finding no error, we affirm their convictions.

This appeal also involves a third Trice associate, Eric Bard, who pleaded guilty to distribution of 50 grams or more of methamphetamine. See 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). The district judge sentenced him to 262 months, the very bottom of his Sentencing Guidelines range. Bard argues on appeal that his sentence is substantively unreasonable. We disagree, and thus affirm his sentence too.

I

A

We begin with McClure and Payne's *Batson* argument. We defer to a district court's *Batson* findings and review those findings only for clear error. *United States v. Jones*, 56 F.4th 455, 477 (7th Cir. 2022). "Unless we arrive at a definite and firm conviction that a mistake has been made," we will affirm. *Id.* (cleaned up). As opponents of the strike, McClure and Payne bear the burden of proving the existence of purposeful discrimination. *Johnson v. California*, 545 U.S. 162, 170–71 (2005).

Prosecutors are prohibited from "discriminat[ing] on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2234 (2019). Courts use a three-step framework to determine whether a *Batson* violation has occurred. First, the defendant "must make a prima facie case that the peremptory strike was racially motivated." *Jones*, 56 F.4th at 477. Second, if such a showing is made, the prosecution "must then provide a non-discriminatory explanation for its decision to strike the juror." *Id.* At the final step, the district court determines "whether the defendant has carried the burden of showing purposeful discrimination—that is, that the government's race-neutral justification is not credible." *United States*

*v. Howard*, 67 F.4th 876, 879 (7th Cir. 2023). In doing so, the district judge considers all the relevant circumstances, including the prosecutor's demeanor, to determine "the *honesty*—not the accuracy—of a proffered race-neutral explanation." *Jones*, 56 F.4th at 477; see also *United States v. Lovies*, 16 F.4th 493, 500 (7th Cir. 2021). If a prosecutor's proffered reason for striking a Black juror applies equally to an otherwise-similar non-Black juror who was not stricken, "that is evidence tending to prove purposeful discrimination[.]" *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011). While "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination[,]" *Purkett v. Elem*, 514 U.S. 765, 768 (1995), we acknowledge that from a district judge's "firsthand vantage point," he or she is "in the best position to make the determination [of whether] the prosecutors were sincere." *Lovies*, 16 F.4th at 502.

At the beginning of jury selection, the court separated 48 potential jurors into two waves for voir dire. The judge conducted the questioning and asked the following questions of each wave: (1) Have you, any member of your family, or a close friend ever been involved in the criminal justice system whether as a defendant, witness, or victim?; and (2) Have you had any experience involving yourself, any member of your family, or any close friend that relates to the use or possession of illegal drugs or narcotics?

The government used five of its six peremptory challenges during the first wave. During the second wave, the government used its last peremptory challenge on Juror 39, a Black man. McClure and Payne raised a *Batson* objection, arguing that Juror 39 was impermissibly stricken because of his race. Although the court expressed doubts as to whether the

defendants had made a prima facie case, it proceeded to rule on the remaining *Batson* steps, making step one moot. See *id.* at 503 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.")

At the second step, the government provided a permissible race-neutral justification for the strike: Juror 39 answered that his brother had been convicted of drug dealing. See *United States v. Lampkins*, 47 F.3d 175, 178 (7th Cir. 1995) ("[A] prosecutor may permissibly strike a prospective juror on the grounds that close relatives or friends have been convicted of the very crime at issue."). McClure and Payne argued that this reason for striking Juror 39 was pretext because white prospective jurors also answered that their family members had been involved with drugs, yet were not stricken. The government acknowledged that Juror 34 answered that her sister had been incarcerated for writing bad checks and "something to do with drugs," but that she did not know specifics. The defendants also identified Juror 51, who answered that her brother-in-law had been convicted on a charge relating to shipping marijuana from Africa when he was in the Peace Corps in the 1970s, and Juror 62, who answered that her sister had pleaded guilty to methamphetamine possession. The government argued that those jurors were different because only Juror 39 specifically said that he had a brother convicted of drug *dealing*.

At the third step, the district court evaluated the credibility of the government's justification by assessing the prosecutor's demeanor and the reasonableness of his explanation. To

the government, the specificity of Juror 39's answer—that his brother had been convicted of drug dealing, rather than just any general drug charge—differentiated him from Jurors 34, 51, and 62. The court agreed that this was "an appreciable difference," found the prosecutor's demeanor to be credible, and overruled the *Batson* challenge. Ultimately, the jury consisted of twelve white jurors, one white alternate, and one Black alternate.

On appeal, McClure and Payne argue that if the government were not motivated by race, it would have also moved to strike white jurors who had relatives convicted of drug charges. In the district court, McClure and Payne compared Juror 39 to Jurors 51 and 62, while the government acknowledged the similarities between Juror 39 and Juror 34. On appeal, McClure and Payne compare Juror 39 to Jurors 34 and 13 while failing to mention Jurors 51 and 62 at all in their opening brief.

We begin our analysis with Juror 34, who responded that her sister had been incarcerated for "writing bad checks and something to do with drugs." She then apologized, saying "Sorry. I'm not too clear on it." The court asked whether she knew anything more, and Juror 34 responded that she did not. Later, when the court asked whether anyone had a circumstance that would make jury service especially difficult, Juror 34 expressed concerns. She explained that she was an accountant, it was busy season, and she had a long commute to the courthouse. Defense counsel later moved to strike multiple jurors for cause, including Juror 34. Payne's counsel argued that Juror 34 could not be fully attentive throughout trial and should be excused. The government opposed the strike, and the court denied it. Neither defense counsel nor the

government used a peremptory strike on Juror 34, so she was seated.

McClure and Payne's arguments related to Juror 34 are twofold. First, they argue that if the government was genuine about not wanting jurors who had a relative convicted of drug dealing, it would have used one of its peremptory strikes on Juror 34. Second, they argue that at the very least, if the government were sincere, it would not have opposed their motion to strike Juror 34 for cause. We consider each argument, keeping in mind our deferential standard of review.

The defendants ask us to engage in a side-by-side comparison of Jurors 39 and 34. When offering its race-neutral reason for striking Juror 39, the government explained that it viewed his answer—about his brother's involvement with drugs—differently from Juror 34's answer. While Juror 39 knew his brother had a conviction for drug dealing, Juror 34 did not know any details of her sister's conviction. All Juror 34 knew was that her sister was convicted of "something to do with drugs." While in theory her sister could have been convicted of drug dealing like Juror 39's brother, Juror 34 expressly stated that she was unclear on the specifics and neither the government, the defense, nor the judge pressed her any further. On this record, we cannot say that the judge clearly erred in concluding that the government drew a credible race-neutral distinction between Jurors 34 and 39, and further, that the government honestly struck the latter because his brother was convicted of drug dealing. And nothing about the government's earlier opposition to defendants' for-cause challenge to Juror 34 suggests any discriminatory motive.

We now consider Juror 13. The government suggests that McClure and Payne waived their argument regarding Juror

13 because they never raised this comparison as part of their *Batson* challenge below. See *United States v. Brown*, 809 F.3d 371, 374 (7th Cir. 2016) ("It is the defendant's burden to raise specific arguments that the government's justification was pretextual so that the court can properly address them."). Nevertheless, the Supreme Court has suggested that "a retrospective comparison of jurors based on a cold appellate record" is permissible in at least some circumstances. *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). And because we conclude that the substance of McClure and Payne's comparison argument lacks merit as to Juror 13, we need not decide the waiver issue. See *Brown*, 809 F.3d at 374 n.1 (declining to address the government's forfeiture argument when the defendant's comparison argument lacked merit).

Juror 13 answered that her son had been convicted of a drug charge. She also expressed that although she "had issues with the judge" in his case, she believed her son received a fair trial. McClure and Payne argue that if the government had truly wanted to strike jurors with relatives convicted of drug dealing, it would have moved to strike Juror 13 or at the very least, would have requested that the court ask follow-up questions about her son's conviction and her competency to remain unbiased. But Juror 13, like Juror 34, did not specify what type of drug charge her son was convicted of. There was no mention of drug *dealing*. The comparative net that McClure and Payne ask us to cast is simply too broad. See *Jamerson v. Runnels*, 713 F.3d 1218, 1230 (9th Cir. 2013) (rejecting as too broad a *Batson* comparison based on the fact that accepted jurors also had relatives or knew people associated with a crime). This reasoning applies equally to Juror 62, whom McClure and Payne originally compared to Juror 39 below. Her answer did not indicate that her sister had been convicted

of drug dealing, but only that she pled guilty to a crime in-
volving methamphetamine.

In their reply brief, McClure and Payne also make a half-
hearted comparison of Juror 39 to Juror 51, who answered
that her future brother-in-law (before she met him) had been
convicted on a charge relating to shipping marijuana from Af-
rica while serving in the Peace Corps in the 1970s. The defend-
ants waived this argument by failing to even mention Juror
51 in their opening brief. See *United States v. Webster*, 775 F.3d
897, 904 (7th Cir. 2015) (noting that arguments not raised in a
party's opening brief are waived). So, we do not consider it
further.

Lastly, McClure and Payne raise a broader argument
about how the government should have asked follow-up
questions to the jurors who responded that they had relatives
with drug charges. Because it was the judge who conducted
the voir dire, not the parties, we understand their argument
to be that the prosecutor should have requested follow-up
questioning to determine the nature of those charges. The
government's failure to ask the court to inquire further about
potential jurors' responses that supposedly motivated a per-
emptory strike can be evidence of pretext. *Harris v. Hardy*, 680
F.3d 942, 962 (7th Cir. 2012) (citing *Miller-El v. Dretke*, 545 U.S.
231, 246 (2005) ("The prosecution's reason [for striking a ju-
ror] … is not creditable in light of its failure to enquire about
the matter.")). But in this case, we cannot say that the judge
clearly erred by failing to read into the absence of such a re-
quest. Jury selection moved quickly and neither party asked
the court to conduct additional questioning. Nothing about
the government's silence in this situation suggests it had a dis-
criminatory motive. See *Brown*, 809 F.3d at 375 ("The jury

selection process moved quickly and neither counsel asked any questions. Thus, it appears likely that the government did not want to interrupt the flow of the proceeding, not that it was trying to deceive the court."). And while follow-ups may have clarified some jurors' answers, it would have been futile with others. For example, Juror 34 expressed that she had no further knowledge of the nature of her sister's conviction. In her situation, further questioning would have been entirely unhelpful. See *id.* (concluding that since a potential juror's answer was "clear enough on its face," it was "unlikely that further questions would have changed the government's impression").

The focus of the pretext inquiry is on what the government actually knew at the time it struck the juror, and what it knew here was that Juror 39's brother had a drug dealing conviction. To the district court, this sufficiently differentiated Juror 39's answer from those of other jurors, and the court adjudged the prosecutor's demeanor to be sincere and genuine after considering the totality of the circumstances. We accord the court's credibility determination great deference, and because the government's reason for striking Juror 39—that his brother was convicted of drug dealing—was not "completely outlandish," we have no basis to reverse. *United States v. Jones*, 224 F.3d 621, 625 (7th Cir. 2000).

B

The government's primary trial witness was Detective Jason Hart, who has more than twenty years of experience as a law enforcement officer in the Indianapolis area. In 2017, Detective Hart received a tip about the 700 block of Arnolda Avenue: drug dealing, robberies, violence, and intimidation were unfolding under the watch of Trice and his associates.

Detective Hart, who at the time was an ATF task force officer, took the information to the FBI, thus beginning the joint investigation that ultimately led to the federal prosecution of McClure and Payne. On appeal, McClure and Payne object to Detective Hart's trial testimony on multiple fronts. We summarize Detective Hart's testimony, and then address their objections.

1

The government disclosed Detective Hart as both a fact and expert witness and called him to testify twice. On the first day of trial, Detective Hart initially testified as a fact witness and told the jury about how the investigation into the 700 block of Arnolda Avenue unfolded. The court then admitted him as an expert in drug trafficking, briefly explaining to the jury that he was being designated an expert based on his education, training, experience, or knowledge. Detective Hart then explained how drug deals are usually made, including how dealers use lookouts for security and are disinclined to deal with strangers. Next, the government notified the court that it intended to "ask questions of Detective Hart as a fact witness and no longer as an expert witness." The judge responded "All right. Thank you." Detective Hart went on to describe the events of October 21, 2018, from his own personal observations. He told the jury that at 12:51 pm, Trice called McClure. The call was recorded, and the recording was played for the jury:

> McCLURE: Hello?
>
> TRICE: How you what nasty?
>
> McCLURE: What's happening?
>
> TRICE: Chillin.

MCCLURE: Shit, I ain't doin shit. Bout to come down that way in a minute. I'm about to take my girl to the library. Shit, what's the, uhh, what's the ticket?

TRICE: Two.

MCCLURE: Two?

TRICE: Yep.

MCCLURE: Alright. Uhh, I'm on my way from the crib. I'll be down there in about like thirty minutes.

TRICE: Alright, just hit me up.

MCCLURE: Alright.

TRICE: Alright.

After the recording was played, Detective Hart explained that the phrase "what's the ticket" was commonly used by Trice and his associates to refer to the price of drugs. Detective Hart explained that he believed there was about to be a drug transaction for $2,000 and got a team in place to surveil the area.

Detective Hart narrated, based on his own observations, as surveillance footage from a telephone pole camera played for the jury: Trice drove his red Jeep to the 700 block of Arnolda Avenue. McClure and Payne arrived together in a silver Dodge and briefly met with Trice. Trice then drove to his apartment where he was suspected of storing large quantities of meth, briefly went inside, and drove back to the 700 block of Arnolda Avenue. McClure entered the passenger seat of the red Jeep to speak with Trice. A moment later, McClure exited the Jeep and returned to the passenger seat of the silver Dodge with Payne. McClure and Payne drove away.

Surveillance footage ended there, but law enforcement followed them.

From his own memory, Detective Hart testified that Payne next dropped off McClure at a different vehicle. With limited resources, the officers let McClure elude them in favor of continuing to follow Payne. Detective Hart explained that surveilling officers believed—based on their prior observations—that McClure had brokered a deal for Payne and that Payne would be the one with drugs in his vehicle. Detective Hart instructed law enforcement to initiate a traffic stop on the Dodge that Payne was driving. Rather than stop, Payne led the officers on a high-speed chase.

Other government witnesses detailed what happened next. Trooper Ryan Kenworthy pursued Payne. He testified that, during the chase, he saw a white object fly out of the driver's side window of the Dodge. Other officers located the white object—a sock containing 214.2 grams of methamphetamine. The chase ended when Payne collided with a median, allowing officers to apprehend him.

On the second (and last) day of trial, Detective Hart was called to testify again. The government once again moved to offer him as an expert in drug trafficking. After no objection, the court admitted him and gave the following instruction to the jury:

> THE COURT: Ladies and gentlemen, remember that from time to time, based on a witness's experience or knowledge or specialized training, that we allow them to give opinions on certain matters that they may not have specifically seen but, again, is based on this experience, expertise,

and knowledge, training; and we allow them to give opinions on that. As you will be instructed and have been instructed, you're entitled to give that whatever weight that you believe it deserves; but they are allowed to make their opinions, and I'm going to designate Agent Hart as requested in this case. Go ahead.

After asking just four brief questions eliciting testimony about how much methamphetamine a user would typically purchase at a time, the government signaled that it no longer sought to offer expert testimony and would return to offering testimony based on Detective Hart's personal observations. The judge clarified, "All right. So no more expert testimony at this time," to which the government responded "Thank you, Your Honor."

The government then introduced and played for the jury a jail call between Payne and McClure from the day after Payne's arrest. The government occasionally paused the recording to question Detective Hart about what he understood certain terms to mean based on his knowledge acquired from the investigation. For example, when McClure asked Payne whether law enforcement took both of Payne's "hitters," Detective Hart explained that this was slang for phones. Payne expressed paranoia that he had been set up and asked McClure whether "the [guy] that washed the truck for me … Is he one hundred?" Detective Hart explained that Payne was asking whether Trice was a turncoat. McClure responded with "you don't' [sic] know him from a can of paint," which Detective Hart interpreted as McClure explaining that since Trice didn't know Payne, there's no way Trice could have set Payne up like that. Payne later told McClure that if he wanted

to "take [his] seat" while he was in jail, he would "put [McClure] all the way in." Detective Hart explained that he understood Payne to be offering to put McClure in touch with his customers to keep up the business while Payne was in jail.

2

McClure and Payne raise three issues with respect to Detective Hart's testimony. They argue: (1) the district court failed to follow the dual-testimony procedures established by this court in *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018); (2) Detective Hart's interpretations of the conversations in the two phone calls were inadmissible; and (3) Detective Hart impermissibly opined on the defendants' guilt. We address each argument in turn.

i

We start with Detective Hart's dual-role testimony and the defendants' assertion that the court failed to follow the guidance we set forth in *Jett*. Neither McClure's nor Payne's defense counsel objected at trial, so our review is only for plain error. *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). This standard requires the defendants to show: (1) an error; (2) that is plain; (3) that affected their substantial rights; (4) and that "seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Id.*

It is routine for a law enforcement officer to act as a dual-role witness, offering both lay and expert testimony. *United States v. Parkhurst*, 865 F.3d 509, 518 (7th Cir. 2017). But we have recognized that there are "inherent dangers" with this practice. *Jett*, 908 F.3d at 267. For example, jurors may "unduly credit the opinion testimony due to a perception that the expert was privy to facts about the defendant not presented

at trial" or be unduly influenced "by an expert's aura of special reliability." *Id.* (cleaned up). In *Jett*, we held that district courts must take certain precautions to avoid admitting confusing dual-role testimony. *Id.* at 268. The goal is to help juries understand whether to evaluate the testimony based on the witness's personal knowledge (under Federal Rule of Evidence 701) or based on the witness's qualifications, training, and methods (under Federal Rule of Evidence 702). *Id.* We advised the district judge to first "encourage the government to present the expert and lay testimony separately." *Id.* at 269. "[W]hen the expert portion of the case agent's testimony begins, the district judge should allow the government to lay its foundation and establish the agent's qualifications." *Id.* Next, the judge "should instruct the jury that the testimony it is about to hear is the witness's opinion based on training and experience, not firsthand knowledge, and that it is for the jury to determine how much weight, if any, to give that opinion." *Id.* at 269–70. And at the end of the trial, the judge should give an adequate jury instruction that reinforces the jury's duty to weigh fact and expert testimony separately, under their applicable standards. *Id.* at 270.

Defendants argue that the district court did not follow the guidance we provided in *Jett* perfectly at trial, but that is not the test for reversal. The court mostly adhered to *Jett*'s principles and crucially, the different types of testimony were presented separately. The government properly segmented Detective Hart's expert testimony into two discrete portions of his direct examinations. The government also laid the appropriate foundation for his qualifications. Both times he testified as an expert, the court adequately delineated the expert testimony by instructing the jury that Detective Hart was about to testify as an expert and by signaling when that portion of the

examination had concluded. The court also explained that when a witness gives an expert opinion, it is based on his expertise, knowledge, and training rather than personal observation. We recognize that the court could have more clearly articulated to the jury that Detective Hart's expert opinions were to be weighed separately from his fact testimony, and that the members of the jury were entitled to give those opinions however much weight they believed appropriate. But this shortcoming did not amount to plain error. And at the end of trial, the court gave a final jury instruction that all parties jointly submitted, agreed to, and do not challenge on appeal.

Even if there were errors under *Jett* that were plain (there weren't), they did not affect the defendants' substantial rights or "seriously affect[] the fairness, integrity[,] or public reputation of judicial proceedings." *Molina-Martinez*, 578 U.S. at 194. Detective Hart's testimony was corroborated by video surveillance, phone recordings, and physical evidence. As will be discussed below, the evidence of the defendants' guilt was convincing, making any error harmless. See *United States v. Cosby*, 924 F.3d 329, 337 (7th Cir. 2019) (rejecting a plain error challenge under *Jett*). Accordingly, reversal based on the court's instructions regarding Detective Hart's dual-role testimony is not warranted.

ii

McClure and Payne also object to Detective Hart's testimony interpreting their phone calls. Because they preserved this argument by objecting at trial, we review for abuse of discretion. *United States v. Hilliard*, 851 F.3d 768, 779 (7th Cir. 2017). As Detective Hart's testimony was offered as a lay (or firsthand) witness, our analysis is guided by Federal Rule of

Evidence 701. Under Rule 701, a lay opinion "is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* at 779–80. A law enforcement officer's lay opinion is limited to his "observations or other facts derived exclusively from a particular investigation." *United States v. Malagon*, 964 F.3d 657, 662 (7th Cir. 2020).

McClure and Payne argue that there was insufficient foundation for Detective Hart to interpret McClure and Payne's conversations because he was unfamiliar with either of them until October 21. They suggest that to offer a lay opinion interpreting these phone calls, Detective Hart must have previously investigated McClure and Payne individually, and that his knowledge acquired from the broader investigation is insufficient.

But this is not what Rule 701 requires. Even though Detective Hart had not specifically investigated McClure or Payne, his foundational knowledge still derived from the "particular investigation" into Trice's drug operation. *Id.*; see also *United States v. Rollins*, 544 F.3d 820, 831–32 (7th Cir. 2008) (holding that the district court did not err in admitting an agent's testimony interpreting drug code when the agent had extensive personal knowledge of the organization's habits and how it operated). Detective Hart had been investigating Trice and his associates for months. He became intimately familiar with how the organization operated. He had listened to many intercepted phone calls and learned the lingo commonly used when discussing drug transactions. For example, he testified that he had overheard the use of the term "ticket" about 40

times while monitoring phone calls throughout the investigation. The district court committed no error in allowing Detective Hart to draw from his extensive experience with the broader investigation into Trice's drug trafficking organization when interpreting the words and behavior of its individual members.

We make one final observation about the testimony regarding Payne and McClure's jail call. We have previously warned that officers should not interpret terms with which they are no more familiar than others. *Jett*, 908 F.3d at 266 ("We caution, however, against conflating commonly used slang or vernacular with the code words of a criminal milieu."). We can hardly say that phrases such as "tickets," "hitters," "jump-out boys," or "memory card" would have otherwise been understood by the jury. Detective Hart's interpretation of this coded language was thus proper. But some of his testimony interpreting ordinary slang such as "you don't know him from a can of paint" and "I knew what it was" veered close to crossing the line into improper narration. Any such error in permitting this testimony was harmless, however, due to the strength of the government's case. Accordingly, Detective Hart's testimony interpreting the phone calls is not a basis for reversal.

iii

McClure and Payne's final evidentiary argument is that the district court improperly allowed Detective Hart to opine on their guilt by describing their meeting as a drug

transaction. They preserved this argument as well, so we re-view for abuse of discretion. *Hilliard*, 851 F.3d at 779.

The relevant testimony came during McClure's counsel's cross-examination of Detective Hart, where she tried to cast doubt on his perception of the events of October 21:

> Q: Sir, you testified that you were not physically present on Arnolda Avenue to witness a drug purchase, correct?
>
> A: That is not -- I said I was not physically on Arnolda Avenue. I witnessed the transaction via the video.
>
> DEFENSE COUNSEL: Judge, I would ask that that answer be stricken. It's not answering the question.
>
> THE COURT: I think it did. It's overruled.
>
> Q: So since you were not physically present on Arnolda Avenue on October 21st, 2018, you cannot tell these ladies and gentlemen that you actually physically witnessed that in person, correct?
>
> A: That's inaccurate. I think they witnessed it now. They watched the video.
>
> Q: I'm sorry. Did you say the jurors witnessed it?
>
> A: Ma'am, I'm confused. We all just watched the video of the narcotics transaction take place. That's what 38 minutes of video was about. I'm confused by the question.

It was defense counsel who was the first to describe what the jury saw as a drug transaction. Detective Hart accepted counsel's framing to clarify a less than clear line of questioning. There was no error in permitting Detective Hart's testimony, and even if there were, such an error would have been invited by defense counsel's own questioning. This was hardly an example of a witness impermissibly giving an opinion "that would merely tell the jury what result to reach." *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017) (cleaned up). Accordingly, the district court did not abuse its discretion in admitting this testimony.

C

Finally, McClure and Payne argue that there was insufficient evidence for the jury to convict them. They preserved this argument below by moving for a judgment of acquittal. We view the evidence in the light most favorable to the government and ask "whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). We will "overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the factfinder could find guilt beyond a reasonable doubt." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (cleaned up). For a jury to convict McClure and Payne of possession with intent to distribute, the government needed to prove that they (1) knowingly or intentionally possessed methamphetamine (2) with intent to distribute it (3) while knowing it was a controlled substance. See *United States v. Irby*, 558 F.3d 651, 654 (7th Cir. 2009).

Despite McClure and Payne's contentions, the government presented more than sufficient evidence to support their

convictions. First, the jury heard a recording of McClure speaking with Trice shortly before they met on Arnolda Avenue on October 21. Detective Hart spent months learning how Trice's organization operated. The jury was entitled to give weight to his testimony that their language—specifically, the use of the phrase "what's the ticket" and the response "two"—suggested that a drug transaction for $2,000 was imminent. Second, the jury watched video surveillance from October 21 corroborating Detective Hart's interpretation. Footage showed Trice coming and going from his apartment between meetings on Arnolda Avenue, as law enforcement had observed during earlier drug deals. The jury watched video of McClure exit Payne's car, briefly enter Trice's car, and then return to Payne's car. The jury also heard that this pattern of movement resembled other drug deals Trice had carried out. Third, multiple government witnesses testified that after dropping off McClure, Payne fled from police and threw a white object out of the driver's side window. This object turned out to be a sock containing 214.2 grams of methamphetamine, and the jury heard evidence that this was roughly 40 times the amount consistent with personal use. Finally, the jury heard a recording of McClure and Payne's jail phone call discussing the previous day's events in language consistent with drug dealing.

McClure and Payne cite cases in which we found the evidence insufficient to support drug convictions. See *Garcia*, 919 F.3d at 504; *Jones*, 713 F.3d at 352. But the facts of those cases are far different from this case. Here, the evidence of McClure's and Payne's guilt was not just sufficient but overwhelming. A rational juror could certainly conclude that McClure brokered a deal with Trice for the purchase of methamphetamine on Payne's behalf, and when Payne realized

law enforcement was following him, he threw the methamphetamine out of his car.

## II

We next turn to Eric Bard's sentencing challenge. Bard pleaded guilty to knowingly distributing 50 grams or more of methamphetamine. See 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). The district court calculated a Guidelines range of 262 to 327 months, which Bard admits is correct. The district judge sentenced him to 262 months, a sentence Bard now calls unreasonable. Some of Bard's arguments sound more like procedural rather than substantive challenges. Bard frames them all as substantive, however, and the government accepted this framing. We do as well, noting that we would affirm whether these challenges are procedural or substantive.

When a defendant disputes the substantive reasonableness of a sentence, we review for abuse of discretion. *United States v. Walsh*, 47 F.4th 491, 496 (7th Cir. 2022) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "[W]e do not substitute our judgment for that of a district judge, who is better situated to make individualized sentencing decisions." *United States v. Daoud*, 980 F.3d 581, 591 (7th Cir. 2020). A reasonable conclusion "that a different sentence was appropriate is insufficient to justify reversal[.]" *Gall*, 552 U.S. at 51. We will reverse only if the "sentence falls outside the broad range of objectively reasonable sentences in the circumstances." *Daoud*, 980 F.3d at 591 (cleaned up). A within-guidelines sentence is presumptively reasonable. *United States v. Miller*, 834 F.3d 737, 744 (7th Cir. 2016). Here, not only did Bard's sentence fall within the Guidelines range, but it was at the absolute bottom of that range. Accordingly, he faces an uphill battle.

Bard contends that his Guidelines range was far greater than necessary to comply with the goals of 18 U.S.C. § 3553(a) and that the district judge's justification was inadequate. He argues that his minor past violations overstated his criminal history and had a distorting effect on his Guidelines range, which resulted in a sentence that is unfairly disproportionate to co-defendants who played a much bigger role in the drug operation. Bard also believes the district judge misconstrued his criminal history argument as one questioning the policy and concept of the career offender enhancement in general, rather than one asking the court to consider that since he barely qualified for the enhancement, it should not drive his ultimate sentence. Finally, he argues that due to his age and health conditions, he received nearly a life sentence. None of these arguments justifies reversal.

First, Bard's criminal history was not overstated. Bard qualified as a career offender because of two prior felony convictions for controlled substance offenses. He also has a history of resisting arrest, domestic battery, and probation violations. It is true that were it not for the career offender enhancement, his Guidelines range would have been cut in half—down to 130 to 162 months. But that is not the case here. The judge observed that Bard had received "multiple breaks" in the past and characterized his record as a "history of not getting the message[.]" Without the enhancement, he believed Bard's "criminal history would [have] be[en] understated[.]"

Second, Bard highlights the seeming disparity between his sentence and those of his co-defendants who were more culpable. For instance, Trice, the drug organization's leader, only received 210 months, while Bard received 262 months for a single $1,200 transaction. But "only *unwarranted* disparities

are impermissible in sentencing." *United States v. Pape*, 601 F.3d 743, 750 (7th Cir. 2010). Disparate sentences can certainly be warranted even when a less culpable co-defendant receives a longer sentence. *United States v. Solomon*, 892 F.3d 273, 279 (7th Cir. 2018). Here, the district judge acknowledged his responsibility under § 3553(a)(6) to avoid unwarranted disparities and did not need to engage in a lengthy comparison of Bard's culpability with those of his co-defendants before imposing a within-Guidelines sentence. See *Pape*, 601 F.3d at 750. The simple fact is that Bard's criminal history differentiated him from his co-defendants, which increased his Guidelines and justified his longer sentence.

Third, the judge clearly understood Bard's argument to be about his own personal criminal history, rather than mistaking it for one about policy. The court did not consider it as a challenge to the career offender enhancement as a whole, but as applied to him. The court explained that Bard's past run-ins with the law "have consequences" and that application of the enhancement was the appropriate consequence, even if he only narrowly qualified for it.

Finally, though we by no means suggest that 262 months is insignificant, we are not persuaded by Bard's argument that it is in effect a "nearly life sentence." But Bard was only 34 at the time of sentencing and assuming he serves his full 262 months, he will be in his mid-50's at the time of release. As he has not presented sufficient evidence suggesting that he will not live out his sentence, we do not consider this argument further. See *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006); *United States v. Patrick*, 707 F.3d 815, 820 (7th Cir. 2013).

At bottom, Bard believes his sentence is just too long. The district court correctly calculated the Guidelines, considered all the relevant statutory factors and principal arguments in mitigation, and explained its reasoning before imposing a bottom-of-the-Guidelines sentence. The district judge explained that although he believed a sentence in the middle or upper end of the Guidelines range would be appropriate, he would "show some leniency" and sentenced Bard to the very bottom of the Guidelines range. Far from an abuse of discretion, the district court gave thoughtful consideration to Bard's arguments. It simply disagreed with them, as do we.

AFFIRMED